**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BRANDON WAYNE HEDRICK,
　　　　　*Petitioner-Appellant,*

v.

WILLIAM PAGE TRUE, Warden,
Sussex I State Prison,
　　　　　*Respondent-Appellee.*

No. 04-32

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, District Judge.
(CA-03-219-7)

Argued: November 30, 2005

Decided: March 31, 2006

Before WIDENER and GREGORY, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Gregory wrote the opinion for
the court in Parts I, II, and III, in which Judge Widener and Senior
Judge Hamilton joined. Senior Judge Hamilton wrote the opinion for
the court in Parts IV and V, in which Judge Widener joined. Judge
Gregory wrote a separate opinion dissenting in part from Part IV and
concurring in the judgment only in Part V.

---

## COUNSEL

**ARGUED:** Robert Edward Lee, Jr., VIRGINIA CAPITAL REPRE-
SENTATION RESOURCE CENTER, Charlottesville, Virginia, for

Appellant. Robert H. Anderson, III, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** James O. Broccoletti, ZOBY & BROCCOLETTI, Norfolk, Virginia, for Appellant. Judith Williams Jagdmann, Attorney General of Virginia, Jerry P. Slonaker, Senior Assistant Attorney General, Robert Q. Harris, Senior Assistant Attorney General, Richmond, Virginia, for Appellee.

---

## OPINION

GREGORY, Circuit Judge, writing for the court in Parts I through III:

Brandon Wayne Hedrick was convicted by a Virginia jury of capital murder in the commission of robbery, rape, and forcible sodomy and sentenced to death. After an unsuccessful direct appeal and habeas petition in the Supreme Court of Virginia, Hedrick sought federal habeas corpus relief from the United States District Court for the Western District of Virginia. The district court dismissed all of Hedrick's claims. We granted certificates of appealability on Hedrick's claims that: (1) he received ineffective assistance of counsel in violation of his Sixth Amendment rights; (2) the government failed to disclose information favorable to Hedrick in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) his execution is unconstitutional under *Atkins v. Virginia*, 536 U.S. 304 (2002). We affirm the dismissal of these claims.

I.

The Supreme Court of Virginia opinion affirming Hedrick's convictions contains a detailed narrative of the facts shown by the evidence presented at trial. *See Hedrick v. Commonwealth*, 513 S.E.2d 634, 636-38 (Va. 1999) [hereinafter *Hedrick I*]. We briefly recount the relevant facts here.

On May 10, 1997, Hedrick and Trevor Jones spent the evening consuming alcohol, smoking crack cocaine and marijuana, and employing the services of four prostitutes. After driving the last two prostitutes back to downtown Lynchburg, Virginia, Hedrick and Jones

saw Lisa Yvonne Crider. Jones knew that Crider's boyfriend was a crack cocaine dealer, and the two decided to pick Crider up, have sexual relations with her, and rob her of any crack cocaine in her possession. Crider voluntarily traveled with Hedrick and Jones back to Jones's apartment, where Jones paid Crider $50 to have sexual intercourse with him. Afterwards, Hedrick retrieved a shotgun from Jones's car at Jones's direction and robbed Crider of the $50 at gunpoint. Hedrick and Jones handcuffed Crider, duct-taped her eyes and mouth, and led her out to Jones's truck. The three left the apartment around 1:00 a.m. *Hedrick I*, 513 S.E.2d at 636-37.

After driving for some time, Jones stopped the truck because Hedrick wanted to have sexual intercourse with Crider. Hedrick raped Crider after telling her not to "try anything" because he had a gun. *Id.* at 637. Afterwards, the two men decided to kill Crider, fearing retaliation from Crider's boyfriend for the rape. As they drove in search of a suitable location, Crider, pleading for her life, asked if there was anything she could do to keep them from killing her. Hedrick told Crider, "if you suck my dick, I'll think about it," at which point Crider performed oral sodomy on Hedrick. *Id.*

They continued driving until daybreak, when Jones stopped the truck near the James River. Jones led Crider to the riverbank, told Hedrick to "do what you got to do," and walked back to the truck. *Id.* Hedrick shot Crider and left with Jones. The two men fled Virginia in Jones's truck the next day. That evening, Crider's body was discovered at the James River with a shotgun wound to the face. About one week later, the authorities arrested Hedrick and Jones in Lincoln, Nebraska. *Id.* at 637-38.

At Hedrick's trial, the Commonwealth presented DNA and forensic evidence in addition to eyewitness testimony from Jones and others. Hedrick testified on his own behalf, discussing his extensive drug and alcohol use the day of the crime and in the months leading up to it, denying sexual contact with Crider after her abduction, and claiming that the shooting was accidental. Trial Tr. 464-79.[1] The jury convicted

---

[1]The complete transcript of Hedrick's trial was not included in the Joint Appendix. References to "Trial Tr." refer to the continuously paginated, five-volume transcript of these proceedings, which occurred May 18-22, 1998.

Hedrick of capital murder in the commission of robbery, rape, and forcible sodomy; robbery; rape; forcible sodomy; abduction; and use of a firearm in the commission of murder. *Hedrick I*, 513 S.E.2d at 635.

At the sentencing phase of the trial, prosecutors called a number of witnesses to testify regarding Hedrick's behavior in jail, including his escape attempts and destruction of property. They presented evidence of Hedrick's past robberies involving knives and a shotgun and elicited testimony that Hedrick had used racial slurs to describe Crider and others after his arrest. *See, e.g.*, Trial Tr. 693-96, 700. In mitigation, Hedrick's counsel called fifteen witnesses, including clergy, family members, friends, a former cell-mate, and a clinical psychologist. They spoke of Hedrick's remorse and lack of racial prejudice, and they asked that his life be spared. Witnesses stressed that he was respectful and helpful as a child, but had recently gone astray after falling in with a bad crowd and turning to drugs. Family members testified that Hedrick grew up in a normal, two-parent family where he learned right from wrong and was not abused in any way. *See, e.g.*, Trial Tr. 708-10, 713-14, 732 ("He had wonderful parents."). Hedrick's mother testified to the difficulty her son had comprehending his reading and writing assignments from school, which caused him to fall behind his peers and drop out in ninth grade. Trial Tr. 758. She also discussed his problems with alcohol and drug use.

Dr. Gary Hawk, Hedrick's court-appointed clinical psychologist, testified at sentencing that Hedrick was significantly immature for his age and that he had a problem with drugs and alcohol that accelerated in the months leading up to the crimes. He noted Hedrick's low IQ score of 76, which was "far below average," although "not so low as to suggest mental retardation." J.A. 245. Dr. Hawk testified that Hedrick's lack of intelligence, immaturity, and intense drug abuse diminished his ability to reflect and deliberate at the time of the murder. Trial Tr. 791-92.

Finding both that Hedrick posed a "continuing serious threat to society" and that his conduct in committing the offenses was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder," the jury recom-

mended a sentence of death for the capital murder offenses. *Id.* at 894 (applying Va. Code Ann. § 19.2-264.2). Under Virginia law, a finding of either of these aggravating factors alone is sufficient to support a death sentence. *Swisher v. True*, 325 F.3d 225, 232 n.8 (4th Cir. 2003) (citing Va. Code Ann. § 19.2-264.2 and *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998)). The Circuit Court sentenced Hedrick to death according to the jury's recommendation.

On direct appeal, the Supreme Court of Virginia affirmed Hedrick's conviction on February 26, 1999. *Hedrick I*, 513 S.E.2d at 642. Hedrick then filed a petition for a writ of habeas corpus in the Supreme Court of Virginia, claiming, relevant here, that he had received ineffective assistance of counsel and that certain information was withheld from him in violation of *Brady*. J.A. 2038-88. The court referred Hedrick's ineffective assistance claim to the Circuit Court of Appomattox County for an evidentiary hearing. After taking evidence, the Circuit Court submitted its Findings of Fact and Conclusions of Law to the Supreme Court of Virginia on August 16, 2001, concluding that Hedrick's ineffective assistance of counsel claims lacked merit. *Id.* at 2197-2233. Hedrick submitted objections to this report, and the Supreme Court of Virginia ordered briefing on Hedrick's petition. Hedrick briefed only the issues relating to ineffective assistance of counsel.

In June 2002, while Hedrick's state habeas petition was still pending, the United States Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002). In *Atkins*, the Court established that the Eighth Amendment bars the execution of those who are mentally retarded. The Supreme Court of Virginia held oral argument on Hedrick's petition in September 2002. It dismissed his petition on November 1, 2002, adjudicating Hedrick's ineffective assistance of counsel claims on the merits, but finding his *Brady* claim defaulted for his failure to address it in his brief. *Hedrick v. Warden*, 570 S.E.2d 840 (Va. 2002) [hereinafter *Hedrick II*]. Hedrick petitioned for rehearing on December 2, 2002, raising an *Atkins* claim for the first time. Pet. for Reh'g 10, Dec. 2, 2002. The Supreme Court of Virginia denied rehearing on January 10, 2003 without explanation. In April 2003, the Virginia General Assembly added sections 19.2-264.3:1.1 and 19.2-264.3:1.2 to the Virginia Code in response to *Atkins*, which established Virginia's framework for deciding claims of mental retardation. It also

passed section 8.01-654.2, setting forth the procedures for *Atkins* claims by individuals sentenced to death prior to April 29, 2003.

Hedrick next sought federal habeas relief in the District Court for the Western District of Virginia, which dismissed his petition on March 23, 2004. J.A. 2847-98. The district court found that the Supreme Court of Virginia had not unreasonably applied *Strickland* in denying Hedrick's ineffective assistance of counsel claims. *Id.* at 2865. In addition, it found that Hedrick could not overcome the adequate and independent state procedural rule that the Supreme Court of Virginia used to deem his *Brady* claim procedurally defaulted. Because *Atkins* was decided shortly before the Supreme Court of Virginia issued its decision on Hedrick's habeas petition, the district court found that Hedrick's failure to seek leave to amend his petition to add the *Atkins* claim rendered that claim procedurally barred as well. Moreover, the court believed that Hedrick had failed to present a colorable claim of mental retardation. The district court dismissed Hedrick's remaining claims for habeas relief. We granted certificates of appealability on Hedrick's ineffective assistance of counsel, *Brady*, and *Atkins* claims.

## II.

The Supreme Court of Virginia rejected Hedrick's ineffective assistance of counsel claims on the merits. Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we must presume that the factual determinations made by the state court are correct unless the petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. 2254(e)(1). We cannot grant a writ of habeas corpus unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* 2254(d). *See also Williams v. Taylor*, 529 U.S. 362, 405-13 (2000) (explaining AEDPA review). Because the Supreme Court of Virginia correctly identified the *Strickland* standard as the governing legal principle, our task is to determine whether its application of *Strickland* was objectively unreasonable, *see Wiggins v. Smith*, 539 U.S. 510, 520 (2003), reviewing the district court's conclusions in this regard de novo, *Hill v. Ozmint*, 339 F.3d 187, 193 (4th Cir. 2003).

To prevail on an ineffective assistance of counsel claim, the defendant must make two showings: (1) that counsel's performance was deficient; and (2) that this deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Under the first prong, deficient performance is established where "counsel's representation fell below an objective standard of reasonableness," as measured by prevailing professional norms. *Id.* at 688. Scrutiny of the attorneys' performance must be highly deferential to counsel's judgments. *Id.* at 691. Under the second prong, prejudice exists where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. When a defendant asserts prejudice with respect to his sentence, we "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

Two attorneys, Penny Baber and Lee Harrison, represented Hedrick at trial. Hedrick raises numerous arguments that Baber and Harrison were ineffective and that he was prejudiced by their actions and inactions. These arguments fall into three basic categories: (1) investigation and preparation for the sentencing phase of Hedrick's trial (discussed in Part II.A, *infra*); (2) investigation for and performance at trial (discussed in Part II.B, *infra*); and (3) pre-trial performance (discussed in Part II.C, *infra*). We address each argument in turn.

## A.

The first category of Hedrick's ineffective assistance of counsel challenges relates to his attorneys' investigation and preparation for the sentencing phase of his trial. Hedrick argues that Baber and Harrison failed to: (1) adequately investigate the potential mitigating effect of Hedrick's childhood; (2) develop evidence of Hedrick's low intelligence; (3) develop evidence of Hedrick's substance abuse problems; and (4) prepare the lay character witnesses to testify.

## 1.

Hedrick's primary argument is that trial counsel failed to adequately investigate the possible mitigating effect of his childhood. The Supreme Court of Virginia determined that Hedrick could show

neither deficient performance nor prejudice. *Hedrick II*, 570 S.E.2d at 849. We do not believe this determination was objectively unreasonable.

The Supreme Court of Virginia found that counsel collected information about Hedrick's background from his parents, grandparents, former employers, and school personnel, and tried to obtain his school records. *Id.* These factual findings are supported by testimony elicited at the state habeas evidentiary hearing, *see, e.g.*, J.A. 937-38, 1014-15, 1017-19, 1037-38, and clear and convincing evidence does not exist to rebut the presumption that they are correct. However, Hedrick argues that the extent of this investigation was too narrow and that what information counsel did know should have led them to probe further.

"[I]nvestigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), at 93 (1989) [hereinafter ABA Guidelines]) (emphasis omitted). *Strickland* announced that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In *Wiggins*, the Court recently elaborated on an attorney's duty to investigate. 539 U.S. at 523. The Court explained that the relevant inquiry is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*." *Id.* Moreover, "[i]n assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.

Through the investigation counsel did conduct, Baber learned that Hedrick's father had problems with alcohol in the past, that Hedrick's parents allowed him to drink at home to keep him from doing so on the street, and that Hedrick's parents had used marijuana. J.A. 937-39. In speaking with Hedrick's family, Baber testified that he got the impression that these aspects of Hedrick's upbringing were not signif-

icant, and that Hedrick's father had resolved his problems with alcohol as he had held a steady job for years. *Id.* at 939, 1019.

Hedrick's trial counsel also retained Dr. Hawk, a psychological expert, to help identify and present mitigating evidence.[2] *Hedrick II*, 570 S.E.2d at 852. Dr. Hawk's report to Hedrick's counsel included information about Hedrick's father's previous problems with substance and alcohol abuse, his father's long absences from home due to his job as a long-distance truck driver, and his parents' open drug use and preference that Hedrick use drugs and alcohol at home rather than on the street. J.A. 555-56. However, Dr. Hawk did not suggest to counsel in that report that he believed Hedrick's childhood experiences would be of value to the mitigation case at sentencing or that they merited further exploration. *See id.* at 554-60. Instead, Dr. Hawk identified Hedrick's intellectual limitations, his immaturity, his intoxication and alcohol and drug dependence at the time of the offenses, and his consistent acknowledgment of his role as the mitigating factors worthy of attention. *Id.* at 559.

---

[2]In a related argument, Hedrick asserts deficient performance in counsel's interactions with Dr. Hawk. Dr. Hawk provided an affidavit critiquing Harrison and Baber's performance, which was presented during the state habeas evidentiary hearing. *See* J.A. 482-95. In the affidavit, he stated that counsel failed to communicate effectively with him and provided him with insufficient information.

However, relying on testimony from attorneys at the evidentiary hearing, the Supreme Court of Virginia found as a factual matter that this was not the case. Instead, the court found that counsel requested Dr. Hawk specifically because Harrison was familiar with him from a previous case and Harrison knew that Dr. Hawk would contact them if he needed additional information. *Hedrick II*, 570 S.E.2d at 852. *See also* J.A. 761. The court credited testimony that counsel communicated with Dr. Hawk in preparation for and during trial and provided Dr. Hawk with all the information they had obtained. *Hedrick II*, 570 S.E.2d at 852. Dr. Hawk did not testify in the evidentiary hearing because he was gravely ill at the time and has since passed away. In these circumstances, clear and convincing evidence does not exist to rebut the presumption that the Virginia Supreme Court's factual finding was correct. Thus, Hedrick's claims of ineffective assistance based on counsel's interaction with Dr. Hawk are without merit.

Hedrick's own statements confirmed that an investigation into his childhood would be fruitless. Baber testified:

> I talked to [Hedrick] about the possibility of . . . a mitigation expert and what a mitigation expert might develop. And one of the things was childhood problems and childhood circumstances. And he told me that he didn't want evidence put on that he was—came from a bad home or that he had a bad situation at home. . . . I took that to mean he didn't feel like he did.

*Id.* at 1043.[3] *See also id.* at 555 (Dr. Hawk indicating in his report that Hedrick described his childhood in positive terms, reported fond memories of outdoor activities with his father, and felt close to his mother).

Although counsel knew facts that suggested a less than idyllic upbringing, we cannot say that the Supreme Court of Virginia's determination that counsel's performance was not deficient was objectively unreasonable. Neither Hedrick nor his family indicated that growing up had been a negative experience. Even Hedrick's psychological expert failed to indicate that what was known would be significant to Hedrick's mitigation case. *Wiggins*, the very case Hedrick cites to make his claim, distinguished situations where the known facts suggested further investigations would be unproductive. 539 U.S. at 525. This is especially true where the defendant's own statements discourage further investigation. As the Supreme Court has noted, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

---

[3]The Supreme Court of Virginia found that this statement was a directive not to pursue an investigation into his childhood, and declined to fault counsel for following it. *Hedrick II*, 570 S.E.2d at 852. Hedrick protests that a plain reading of Baber's testimony shows that this interpretation is erroneous and that the statement only indicated that Hedrick did not feel like he had a bad childhood. Reply Br. of Appellant 5-7. We will assume, *arguendo*, that Hedrick's reading is correct because the meaning of this statement is not determinative to our conclusion.

Moreover, even if Hedrick could show an unreasonable application of the law with respect to the performance prong of *Strickland*, he has failed to show prejudice under the second prong. In arguing that he has shown a reasonable probability that his sentence would have been different, Hedrick asserts that further investigation would have uncovered evidence of a dysfunctional and chaotic childhood. He points to several types of evidence to this effect. At the state habeas evidentiary hearing, Hedrick's aunt and uncle testified about a family history of alcohol abuse, that Hedrick's parents fought bitterly, and that they refused to allow their own children to stay with Hedrick's family. J.A. 1140, 1145, 1161, 1170. They noted that Hedrick's brother struggled with attention deficit disorder, causing additional turmoil in the household. *Id.* at 1168.

Hedrick also points to his father's treatment records for drug and alcohol dependence; his mother's criminal record (welfare fraud); and his brother's juvenile file,[4] which all went undiscovered by counsel. Br. of Appellant 25-26. The juvenile file indicated that Hedrick's brother was the product of an alcoholic home that included fragmentation and dysfunction, and that he received incompetent parenting. J.A. 1671.

In addition, Dr. Kent McDaniel, an expert in psychiatry and neuroscience, testified at the state habeas evidentiary hearing that Hedrick's chaotic family environment—specifically, his parents' substance abuse, his father's work-related absences, his parents' psychological limits, his brother's behavioral problems, and recurrent violence in the home—would have been significant to Hedrick's behavior at the time of the offense. *Id.* at 1223, 1240-41.

This evidence, however, does not add up to a reasonable probability that Hedrick's sentence would have been different. In reweighing the evidence in aggravation against this new mitigating evidence, we

---

[4]We note that it is not clear that this confidential juvenile file was "reasonably available" to counsel. *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines 11.4.1(C), at 93)). Hedrick's family had instructed counsel to leave Hedrick's brother, a minor at the time of Hedrick's trial, out of the case. Hedrick's present counsel only obtained access to the juvenile file when Hedrick's brother turned 18 and signed a release.

note that the evidence of a bad childhood was contradicted by other family members' testimony at sentencing. The same aunt and uncle who decried Hedrick's home life admitted that Hedrick was still a "good kid" who was "wonderful" and "compassionate" despite this upbringing. *Id.* at 1155, 1174. Other witnesses testified that Hedrick grew up in a "normal" family with "wonderful parents," had not been abused, and had been taught right from wrong. Trial Tr. 708-10, 713-14, 732. They testified that he was a quiet, helpful, and respectful young man, who had only recently become involved with people who led him into criminal activities. Notably as well, neither Hedrick nor his parents testified at the state habeas evidentiary hearing. Thus, the chaos, fighting, and dysfunction was not confirmed by those in the best position to observe it and was belied by the testimony of most family members. Given the contradictory evidence on this point, it is not at all clear that this additional information outweighs the aggravating evidence supporting the jury's findings that Hedrick posed a continuing serious threat to society and that his conduct in the offense was vile, horrible, or inhuman.

Moreover, it is not clear that the "bad childhood" theory of mitigation would have been more successful than the theory Hedrick's counsel did pursue. Throughout the guilt phase of the trial, counsel emphasized Trevor Jones's leadership role in the crimes and influence over Hedrick in an attempt to deflect blame onto Jones. Sentencing-phase testimony built on that theory through the message that Hedrick was a good kid who had recently been led astray by a bad crowd that included Jones. We do not see how shifting the focus away from Jones's influence on Hedrick to Hedrick's upbringing would have been more convincing to the jury. Accordingly, we cannot say that the Supreme Court of Virginia unreasonably applied the law when it determined that Hedrick had failed to show prejudice under *Strickland*.

2.

Hedrick next argues that his counsel insufficiently developed evidence of his low intelligence, one of the mitigating factors that Dr. Hawk recommended in his report. Hedrick alleges that counsel's investigation was deficient because they failed to request records from a child development clinic (containing assessments of his abili-

ties at age three), failed to question lay witnesses about how Hedrick's poor intellectual functioning affected him outside the academic setting, and failed to discover that he did not receive all of the special education recommended for him because his parents refused those services. In addition, Hedrick faults his counsel for not connecting his low intelligence with a propensity to be easily led and become dependant on drugs and alcohol. Br. of Appellant 21.

The Supreme Court of Virginia found neither *Strickland* prong satisfied. We find Hedrick's inability to show prejudice dispositive because there is no reasonable probability that Hedrick's sentence would have been different had the additional evidence been introduced. The evidence that Hedrick had received low scores on intelligence tests administered at an early age is largely cumulative of testimony from Dr. Hawk and Hedrick's mother during the sentencing phase that he had learning troubles in his youth, and there is no reason to believe that additional evidence would have further driven home this uncontroverted point. *See Moody v. Polk*, 408 F.3d 141, 154 (4th Cir. 2005) ("[P]rejudice does not exist simply because more corroborating evidence could have been presented.").

Likewise, with respect to the connections Hedrick would have had his trial counsel make between his low intelligence, being easily led, and being prone to substance abuse, this, too, was nearly identical to evidence presented. Specifically, Dr. Hawk testified at sentencing that Hedrick's immaturity would have made him susceptible to the influence of his peers and to using drugs. Trial Tr. 788-90. In addition, Dr. Hawk connected Hedrick's low intelligence to his thinking during the offenses. *See id.* at 791-92. Therefore, the failure to connect his low intelligence to other non-academic endeavors and the failure to note that Hedrick did not receive special education do not seem highly relevant by comparison. Accordingly, we cannot deem the Supreme Court of Virginia's finding of no prejudice unreasonable.

3.

In a related argument, Hedrick contends that his counsel failed to develop evidence of Hedrick's substance abuse problems in mitigation. He argues that the evidence pointed to his being intoxicated at the time of the offenses. Br. of Appellant 24-25. Hedrick also argues

that counsel could have discovered a family history of alcohol abuse, which Dr. McDaniel, Hedrick's state habeas evidentiary hearing expert, testified would suggest genetic risk factors for substance abuse.

The Supreme Court of Virginia found that Hedrick's counsel had presented this mitigation evidence in the manner suggested by Dr. Hawk. It noted that Dr. Hawk testified at the sentencing hearing that the use of drugs and alcohol at the time of the crimes "affected his thinking in a negative way." *Hedrick II*, 570 S.E.2d at 853. *See also* Trial Tr. 792. In addition, Dr. Hawk testified at length regarding Hedrick's drug use, possible drug dependency, and consequent black-outs and amnesia. Trial Tr. 789-90. He also connected Hedrick's immaturity with his drug use. *Id.* In light of these facts, we cannot say that the Supreme Court of Virginia unreasonably determined Hedrick was not prejudiced by the failure to present still more evidence related to Hedrick's drug and alcohol use.

4.

Finally, Hedrick argues ineffective assistance at sentencing on the basis that counsel failed to prepare the lay character witnesses for their testimony. Baber had Hedrick's grandmother find family and friends willing to provide positive testimony about Hedrick. Baber did not subpoena any of these witnesses, and indeed did not know who would appear. J.A. 975. He prepared them only through a short meeting the day before their testimony, in which he instructed them to "say something good, but don't make it too good." *Id.* at 1513.

It is true that Hedrick's counsel did little to discuss the substance of their testimony with these witnesses prior to them taking the stand. However, in light of the fact that numerous character witnesses did appear despite not being subpoenaed, and that Hedrick has not shown how the character witnesses' testimony could have been stronger with additional preparation, he has failed to show prejudice.

B.

Hedrick next makes several challenges with regard to his counsel's performance preparing for and during trial. He alleges failures in: (1)

developing evidence that the shooting was accidental; (2) cross-examining investigators; (3) not challenging the jury instruction on forcible sodomy; (4) not submitting a voluntary intoxication instruction; and (5) cross-examining Trevor Jones.

1.

Hedrick's first challenge is to his attorneys' failure to develop the accidental shooting theory of Crider's death. Hedrick himself offered two different scenarios of how the shooting was accidental. In his initial Nebraska statement to police and in his testimony at trial, Hedrick indicated that he had attempted to aim over Crider's head, but missed. J.A. 1582; Trial Tr. 473. However, in his second statement, Hedrick indicated that the gun accidentally discharged when Jones handed it to him. J.A. 593-94.

With regard to the accidental discharge theory, Hedrick argues that the defense could have offered expert testimony that accidental discharge is a common occurrence. However, in light of the fact that not even Hedrick stuck by this story, his counsel cannot be faulted for failing to pursue it. *See* Trial Tr. 483-84 (Hedrick's testimony that the gun did not accidentally discharge).

With regard to the theory that Hedrick meant to shoot over Crider's head, but missed, Baber did not think that this was a "credible theory of the case." J.A. 925. However, Harrison acknowledged that he wanted to find someone to confirm Hedrick's contention that the shooting was accidental. *Id.* at 754-55. Harrison did ask Dr. Oxley, the medical examiner testifying for the prosecution, about his prior statement that the gun was 10 feet away (the prosecution was arguing three to seven feet through a firearms expert). Trial Tr. 388-89. On direct, Dr. Oxley had also testified that the angle of the shotgun wound was "very slightly upward." *Id.* at 378. The defense also presented Hedrick's own testimony that he was aiming over Crider's head.

In attempting to show his counsel could have done more, Hedrick produced the *de bene esse* deposition of Brian Berger, a purported expert in ballistics. J.A. 1996-2037. However, the Supreme Court of Virginia explicitly rejected the testimony of this "part-time gunsmith

and self-taught 'wound ballistics expert.'" *Hedrick II*, 570 S.E.2d at 850. Moreover, the Supreme Court of Virginia determined that the facts simply did not support the suggestion that the shooting was accidental—at close range, the full load of the shot hit Crider's mouth, not the top of her head. *Id.* at 849-50. *See also* Trial Tr. 475 (Hedrick testifying, "I think I was pretty close."). The court also found that the evidence showed that the accidental shooting theory first came from Special Agent Holt, one of the investigators who took Hedrick's Nebraska statement. Indeed, Hedrick admitted at trial that the officers first suggested that it might have been an accident. J.A. 155.

In light of Hedrick's inability to corroborate the accidental shooting theory, we conclude that the Supreme Court of Virginia did not unreasonably apply *Strickland* in finding Hedrick was not prejudiced.[5]

## 2.

Hedrick next challenges counsel's failure to cross-examine investigators Holt and Williamson about Hedrick's first statement. The prosecution used both investigators as witnesses at Hedrick's trial, and defense counsel did not cross-examine Williamson at all and cross-examined Holt only minimally. Hedrick asserts that both men should have been cross-examined with respect to Hedrick's cooperation with investigators.[6]

---

[5]As additional support to its finding of no prejudice here (and in other claims), the Supreme Court of Virginia relied on a "judicial admission" by Hedrick that he was guilty of the crimes charged, which included the intentional killing of Crider and the capital enhancements. *Hedrick II*, 570 S.E.2d at 850. By this, the court referred to a notarized letter from Hedrick in which he attempted to withdraw his habeas petition, stating "I am guilty of the charges in which Im [sic] being obtain [sic] for." *Id.* at 845.

Hedrick argues that clear and convincing evidence reveals that his letter was not a judicial admission. However, we need not decide this question because the alternative reasons provided by the Supreme Court of Virginia for finding no prejudice support the court's conclusions in each instance.

[6]Hedrick also argues that counsel should have challenged the investigators on whether they were the first to suggest the shooting was acci-

Although cross-examination of the two investigators could have yielded testimony that they believed Hedrick was being cooperative when he gave them his statement, *see* J.A. 1108, 1073-74, we agree with the Supreme Court of Virginia that Hedrick can show no prejudice, *see Hedrick II*, 570 S.E.2d at 857. Harrison emphasized with Holt that Hedrick was the first to provide the inculpatory information that he was the triggerman. In addition, counsel elsewhere stressed the fact that Hedrick had always acknowledged that he was the shooter. *See, e.g.*, Trial Tr. 477, 880.

Because evidence of Hedrick's cooperation was thus presented to the jury implicitly in the investigators' testimony and explicitly in other contexts, it was not unreasonable for the Supreme Court of Virginia to determine an additional outright acknowledgment of Hedrick's cooperation by Williamson and Holt would not have influenced the jury's decision as to Hedrick's guilt or sentence.

3.

Next, Hedrick argues that his counsel's performance was deficient in failing to request a jury instruction that would require unanimity on forcible sodomy. Jurors were instructed that to convict on that count, they must find "that the penis of the defendant penetrated into the mouth or anus" of the victim. J.A. 123. The relevant statute requires proof that the accused engaged in "cunnilingus, fellatio, anilingus or anal intercourse" by force. Va. Code Ann. 18.2-67.1. Hedrick argues that counsel should have sought an instruction that required a unanimous finding that either the penis penetrated the victim's mouth, the victim's anus, or both.[7] The Supreme Court of Virginia found that Hedrick suffered no prejudice, as he was also convicted of capital

---

dental. In light of the fact that Hedrick admitted on the stand at trial that the investigators did, in fact, first suggest that it might have been an accident, J.A. 155, we see no prejudice.

[7]The evidence presented at trial supported conviction under either or both theories: Jones testified that Hedrick engaged in oral sex with Crider and sperm consistent with Hedrick's DNA was found in Crider's rectum.

murder in the commission of robbery and rape. *Hedrick II*, 570 S.E.2d at 861.

Hedrick now counters that because the prosecution emphasized the sodomy conviction in urging jurors to choose death, he was prejudiced with respect to his sentencing. This argument is unavailing. First, unanimity as to the means of commission of a crime is not constitutionally required for a conviction. *See Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) ("We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission."). It is therefore not apparent that any proposed instruction would have been accepted by the court, had it been offered.

Moreover, to the extent that the oral sodomy supported the aggravating factor that the offense was "outrageously or wantonly vile, horrible or inhuman," we note that there was substantial other evidence to support this aggravating factor. *See Hedrick I*, 513 S.E.2d at 639-40 (discussing the robbery, rape, binding of Crider's hands, duct-taping of Crider's eyes and mouth, and lengthy abduction). Moreover, the jury here found the additional aggravating factor that Hedrick would be a "continuing serious threat to society," which could serve as an independent basis for imposition of the death penalty. In light of the substantial evidence in aggravation, we cannot conclude that Hedrick was prejudiced with respect to his sentence.

4.

Hedrick next challenges the adequacy of counsel's development of a voluntary intoxication defense and failure to submit a corresponding jury instruction. In Virginia, voluntary intoxication is only a defense "when a person voluntarily becomes so intoxicated that he is incapable of deliberation or premeditation." *Wright v. Commonwealth*, 363 S.E.2d 711, 712 (Va. 1988). The Supreme Court of Virginia determined that the evidence did not support a finding that Hedrick was "significantly intoxicated and impaired" at the time of the killing. *Hedrick II*, 570 S.E.2d at 851. This was not unreasonable.

Specifically, the court noted that Hedrick's accounts of his own intake were vague and inconsistent, that five to seven hours had

elapsed between Hedrick's alcohol and drug intake and the murder, and that Hedrick's conduct just before the murder was planned and purposeful. *Id.* at 850-51. These findings are all supported by the evidence. Moreover, no one, not even Hedrick's state evidentiary hearing expert Dr. McDaniel, could opine with any certainty that Hedrick was intoxicated at the time that he shot Crider. *See* J.A. 1384. The evidence thus did not support a voluntary intoxication defense.

5.

Hedrick next challenges his attorneys' cross-examination of his accomplice Trevor Jones. He submits that counsel were unprepared to question Jones and failed to impeach his testimony. Hedrick proclaims his innocence of rape and sodomy and argues that confidence in his conviction and sentence is undermined because Jones presented the only evidence that the sexual contact Hedrick had with Crider was not consensual.

Hedrick points out that when it was time for Baber to cross-examine Jones as planned, Baber asked Harrison if he wanted to do it instead. J.A. 843. When Harrison indicated that he was unprepared to do so, Baber conducted a cross-examination that emphasized Jones's leadership role in the crimes, but did not impeach his testimony. The impeaching evidence included Jones's inconsistent statements, felony convictions, and animosity toward Hedrick. With regard to Jones's animosity, Hedrick told Baber that when he and Jones were in Campbell jail, Jones said that he would kill Hedrick for talking to the authorities first. *Id.* at 1393-94. Baber had also received an incident report in which Hedrick reported an assault by Jones. *Id.* at 1394-95. Hedrick asserts that this shows Jones's bias and a motive to lie.

The Supreme Court of Virginia did not unreasonably determine that Hedrick showed no prejudice from the failure to cross-examine Jones on his felony convictions and prior inconsistent statements. *Hedrick II*, 570 S.E.2d at 855-56. As both were adduced on direct examination, further questioning on these points would have been redundant.

With regard to counsel's failure to cross-examine Jones about his purported bias, the Supreme Court of Virginia also found a failure to show prejudice to Hedrick's conviction or sentence. *Id.* at 856. This, too, was not an unreasonable application of the law.[8]

Jones's testimony was not, as Hedrick suggests, the only evidence of forced sexual conduct. In his second statement, Hedrick stated that it was "possible" that he had sexual contact with Crider after her abduction, and this came out on cross-examination at trial. Trial Tr. 540. In addition, DNA evidence showed sexual contact in that semen in the victim's vagina and rectum was consistent with Hedrick's DNA. *Id.* at 424. Hedrick's own testimony that the sexual contact he had with Crider was exclusively consensual was also discredited on cross-examination at trial by his prior statements that he had used protection for the consensual sex he engaged in with Crider at the apartment. *Id.* at 528-29. Accordingly, it was not unreasonable for the Supreme Court of Virginia to conclude that Hedrick was not prejudiced by this conviction.

Hedrick also argues prejudice with respect to his sentence on the basis that Jones's testimony was used to support the vileness aggravating factor. However, in light of the substantial evidence offered in support of both aggravating factors, a reweighing against the mitigating evidence does not undermine confidence in the sentence.

## C.

Hedrick's final arguments of ineffective assistance of counsel relate to Baber and Harrison's pre-trial performance. Hedrick argues that counsel (1) failed to collaborate with each other; and (2) gave Hedrick deficient advice and assistance relating to a second statement he made to investigators after his arrest.

---

[8]To the extent that Hedrick frames his challenge as a failure to fully investigate the issue of bias, he cannot show prejudice. Hedrick offers nothing to show what further investigation would have uncovered.

1.

Hedrick first asserts that his counsel failed to communicate with each other, viewed their respective roles differently, misunderstood whether the case was going to trial, and did not discuss a trial strategy until the Friday before. These arguments are largely based upon pre-evidentiary hearing affidavits and depositions from Baber and Harrison. The Supreme Court of Virginia rejected these allegations as a factual matter based upon Harrison and Baber's testimony at the state habeas evidentiary hearing, where they clarified that they engaged in numerous informal discussions leading up to the trial and did prepare for trial, although they expected it to plead out. *Hedrick II*, 570 S.E.2d at 848. Because the court's rejection is well supported by the testimony of both attorneys at trial, we cannot find fault with its decision to credit the attorneys' most recent statements.[9] Moreover, we note that the relevant inquiry is not into how well counsel worked together, but how that pertained to Hedrick's representation.

2.

Hedrick next argues that his counsel's assistance was deficient with respect to a second statement he made to authorities not long after his arrest. Hedrick had given his story to investigators when he was first apprehended in Nebraska, and decided on his own that he wanted to provide them with his version of events again. Although Harrison advised Hedrick not to make the statement, Baber testified that he believed Hedrick "probably couldn't hurt himself, and he might help . . . [so I told him] if you want to get your side of the thing on the record, then you may as well do it." J.A. 944-45.

---

[9]Hedrick now also alleges that Baber failed to advise Harrison about the prosecution's blood spatter expert, and that Harrison was unable to prepare for cross-examination. *See* J.A. 344. Hedrick failed to raise or develop this issue in the state court, and the Warden argues that we should not consider it here. Even if the state court had looked at this issue, Hedrick failed to show prejudice. The blood spatter expert testified to the effect that Crider's body must have been moved after she was killed. *Id.* at 136. Hedrick has not shown that any different cross-examination by Harrison would have affected the import of this testimony.

Hedrick argues that Baber's advice was deficient and that once it became clear that the statement was going forward, counsel should have pursued alternatives such as submitting a written statement or establishing "ground rules" for the questioning. Hedrick argues that these failures harmed his case because the prosecution was later able to use inconsistencies between the second statement and Hedrick's Nebraska statement to impeach his testimony at trial.

The Supreme Court of Virginia found that Hedrick had decided to give the statement with or without counsel's approval and that nothing would dissuade him. *Hedrick II*, 570 S.E.2d at 860. Harrison testified to this effect at the evidentiary hearing, J.A. 737-38, and Hedrick has never contradicted this understanding. Absent clear and convincing evidence that this factual determination was incorrect, Hedrick cannot show prejudice from the advice.[10]

Moreover, Hedrick does not suggest what "ground rules" his counsel should have requested or how a written statement would have been different from the verbal answers Hedrick gave at the time of the interview. We therefore cannot conclude that the Supreme Court of Virginia unreasonably applied the law when it determined that counsel's performance here was not prejudicial under *Strickland*.

In sum, Hedrick has failed to show that the Supreme Court of Virginia unreasonably applied *Strickland* to determine that he received ineffective assistance of counsel. For the same reasons discussed above, even when considering these alleged deficiencies as a whole, we find no prejudice from their collective effect.[11] Accordingly, we

---

[10]*Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1436-37 (9th Cir. 1995), cited by Hedrick, is distinguishable. In that case, the Ninth Circuit found that counsel's advice to provide a statement to police violated *Strickland*. However, in *Harris*, it was the attorney who first suggested giving the statement, and there was no suggestion that the defendant would have done so absent the attorney's advice. *Id.* at 1436-37.

[11]The court dismissed Hedrick's cumulative ineffective assistance of counsel argument as procedurally defaulted for Hedrick's failure to raise it as a separate claim with the state court. J.A. 2887-88. Although the Supreme Court of Virginia addressed Hedrick's arguments separately, Hedrick's petition raises ineffective assistance of counsel as a single claim, which inherently contemplates the totality of counsel's performance. Therefore, the district court was incorrect to reject Hedrick's argument on that basis.

affirm the district court's dismissal of Hedrick's ineffective assistance of counsel claim.

## III.

Hedrick's next claim for relief is that the Commonwealth failed to reveal two of Jones's statements in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The Supreme Court of Virginia deemed this claim procedurally defaulted, and the district court concluded that it could not review the claim because the state court relied on an independent and adequate state ground in refusing to consider it. Hedrick argues that the default rule imposed was not "adequate" and that this Court should remand to the district court for a determination on the merits.[12]

### A.

A federal claims is deemed procedurally defaulted where "a state court has declined to consider the claim's merits on the basis of an adequate and independent state procedural rule." *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998). A federal court cannot review a procedurally defaulted claim unless the prisoner can demonstrate cause and prejudice for the default or a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

"A rule is adequate if it is regularly or consistently applied by the state court . . . and is independent if it does not 'depend[ ] on a federal constitutional ruling.'" *Fisher*, 163 F.3d at 844 (citing *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) and quoting *Ake v. Oklahoma*,

---

[12]The Warden does not direct arguments to the adequacy of the rule, believing the issue is not before this Court. In seeking certificates of appealability, Hedrick proposed both his *Brady* claim and a separate claim that the default rule the state court applied against his *Brady* claim was inadequate. Br. of Appellant 64. The Warden asserts that because this Court denied a certificate of appealability on the latter claim, the default rule's adequacy is not open for consideration here. However, the fact that this Court did not believe a separate constitutional claim could be made out of the adequacy of the state ground does not mean that Hedrick cannot use this argument for his *Brady* claim.

470 U.S. 68, 75 (1985)). Adequacy is itself a "federal question," and, therefore, not within the State's prerogative to decide. *Lee v. Kemna*, 534 U.S. 362, 375 (2002).

In general, a violation of "firmly established and regularly followed state rules" will be adequate to foreclose review. *Id.* (internal quotation marks and citations omitted). Even if a rule is generally sound, a petitioner may show that the state ground is not adequate where: (1) the rule is not "regularly and consistently applied by the state court to a particular type of federal constitutional claim," *Brown v. Lee*, 319 F.3d 162, 170 (4th Cir. 2003) (internal citations omitted); or (2) the rule is exorbitantly applied to the circumstances at issue, *Kemna*, 534 U.S. at 376.

Here, the Supreme Court of Virginia deemed Hedrick's *Brady* claim procedurally defaulted for his failure to address it in his opening brief. *Hedrick II*, 570 S.E.2d at 862. Although Hedrick raised his *Brady* claim in his habeas petition to the Supreme Court of Virginia, *see* J.A. 2084, after the evidentiary hearing on ineffective assistance of counsel, he submitted a brief addressing only that claim and not referencing his *Brady* claim. Under Rule 5:17(c), the brief was required to "list the specific errors in the rulings below upon which the appellant intends to rely." Va. Sup. Ct. R. 5:17(c).

## B.

In challenging the adequacy of Rule 5:17(c), Hedrick first asserts that the Supreme Court of Virginia's construction of Rule 5:17(c) was neither firmly established nor regularly followed because it was applied for the first time in his case. Reply Br. of Appellant 15. However, Hedrick has not challenged the general validity of Rule 5:17(c), which requires litigants to brief assignments of error or else risk waiver. *See Yeatts v. Angelone*, 166 F.3d 255, 264 (4th Cir. 1999) (noting that "[t]he Supreme Court of Virginia had applied [Rule 5:17(c)] numerous times prior to the date Yeatts filed his petition for appeal to refuse to address issues that were not preserved properly with specific assignments of error."). Although Hedrick appears to argue that the unique application of Rule 5:17(c) to these circumstances renders it inadequate, "[c]onsistent or regular application of a state rule of procedural default does not require that the state court

show an undeviating adherence to such rule admitting of no exception . . . when the state procedural rule has, as a general rule, been applied in the vast majority of cases." *Yeatts*, 166 F.3d at 263-64 (internal quotation marks and citations omitted). Thus, even though the Supreme Court of Virginia "previously had not applied Rule 5:17(c) to facts identical to those presented by [Hedrick's] petition," Rule 5:17(c) is nevertheless "firmly established" in its general requirement that briefs must include all assignments of error. *Id.* (citing *O'Dell v. Netherland*, 95 F.3d 1214, 1241 (4th Cir.), *aff'd*, 521 U.S. 117 (1997) ("[W]henever a procedural rule is derived from state statutes and supreme court rules . . . the rule is necessarily 'firmly established.'")). *See also Mueller v. Angelone*, 181 F.3d 557, 584 (4th Cir. 1999) (finding that the petitioner's procedural default under Rule 5:17(c) for failure to brief issues that were designated as assignments of error was an adequate state ground to foreclose review of the federal claim).

Neither of the cases on which Hedrick relies—*James v. Kentucky*, 466 U.S. 341, 348-49 (1984) and *Ford v. Georgia*, 498 U.S. 411, 425 (1991)—stands for his broad proposition that a state court's application of a procedural bar to new facts is an inadequate state ground. First, *James* addressed a situation in which the asserted state ground did not rely on enacted state rules or settled precedent in state common law. The Supreme Court thus found that the defendant's procedural default rested on a distinction between "admonitions" and "instructions," a concept which itself was not established by state law, and concluded that the perceived default was not an adequate state ground to foreclose review of his constitutional claims. *Id.*

Second, *Ford* involved a state supreme court's retroactive application of a state procedural rule requiring contemporaneous *Batson* challenges in a case which pre-dated *Batson v. Kentucky*, 476 U.S. 79 (1986). As such, *Ford* does not address situations in which a rule, firmly established *prior to* the party's procedural default, is applied to a particular fact pattern for the first time. Indeed, *Ford* is distinguishable from the case at bar because here, Rule 5:17(c)'s requirement that the litigants must brief assignments of error had been adopted, announced, and established well before Hedrick's petition.

## C.

Notwithstanding the general validity of Rule 5:17(c), Hedrick relies on *Lenz v. Warden*, 579 S.E.2d 194 (Va. 2003) to establish the inconsistency of the rule's application. In *Lenz*, decided shortly after *Hedrick II*, the Supreme Court of Virginia faced nearly the identical procedural posture presented here, except that in Lenz's opening brief after the evidentiary hearing, the petitioner "incorporated by reference" the assignments of error designated in his petition that were not the subject of the hearing.

The Supreme Court of Virginia acknowledged that in *Hedrick II*, it held that Hedrick's claims "were procedurally defaulted because the petitioner, who had asserted those claims in his petition for a writ of habeas corpus, failed to discuss those claims in his opening brief." *Lenz*, 579 S.E.2d at 196. However, the court found the incorporation by reference controlling, specifically stating, "[w]e think this is a material difference." *Id.* Additionally, the court viewed its holding as an exception to the rule that litigants cannot incorporate by reference arguments that were made in another court or another case, reasoning that:

> Unlike the situation that may exist when a litigant seeks to incorporate by reference arguments filed in another court or in another case, this Court has no difficulty ascertaining the exact arguments that the petitioner has incorporated by reference from other pleadings filed in this Court.

*Id.*

*Lenz* and *Hedrick II* do not appear to be inconsistent. Rather, *Lenz* narrows *Hedrick II* to the extent that petitioners must still brief assignments of error contained in the petition but may satisfy this requirement by incorporating them by reference into the brief. *Cf. Brown*, 319 F.3d at 171-74 (procedural rule inconsistently applied where defendants in six different cases obtained judicial review over merits of their constitutional unanimity claim, whereas the defendant in that appeal did not obtain review).

Alternatively, Hedrick argues that the distinction made in *Lenz* with regard to the insertion of "incorporated by reference" is an "arid ritual of meaningless form" which does not serve a legitimate state interest. Reply Br. of Appellant 16 (quoting *Henry v. Mississippi*, 379 U.S. 443, 447-48 (1965)).[13] However, the Supreme Court of Virginia has held that the purpose served by Rule 5:17(c) is to "point out the errors with reasonable certainty in order to direct this court and opposing counsel to the points on which appellant intends to ask a reversal of the judgment." *Kirby v. Commonwealth*, 570 S.E.2d 832, 834 (Va. 2002) (quoting *Yeatts v. Murray*, 455 S.E.2d 18, 21 (Va. 1995)). The incorporation by reference requirement serves this purpose by putting the Supreme Court of Virginia on notice of the relevant issues on appeal.

## D.

Finally, Hedrick asserts that the Supreme Court of Virginia exorbitantly applied Rule 5:17(c) to his case. Reply Br. of Appellant 13-14. Specifically, Hedrick argues that Rule 5:17(c)'s requirement that the brief list the errors in the "rulings below," referred to the circuit court's rulings on the evidentiary hearing and therefore barred him from briefing issues unrelated to the circuit court's rulings. Br. of Appellant 65-66. In effect, Hedrick maintains that he could not comply with Rule 5:17(c) without causing his *Brady* claim to be "ignored" by the Supreme Court of Virginia. *Id.* at 66.

The Supreme Court has found application of a generally sound rule "exorbitant" and inadequate to foreclose review where: the petitioner substantially complies with the rule; no published state court decision demands perfect compliance; and perfect compliance would not have changed the state court's decision. *Kemna*, 534 U.S. at 387. *See also Wilson v. Ozmint*, 357 F.3d 461, 466 (4th Cir. 2004) (applying *Kemna*). In *Kemna*, the defendant had orally sought a continuance during trial because his witnesses had disappeared, such that he could not raise an alibi defense. Without citing any particular rule, the trial

---

[13]Notably, *Henry*'s precedential value is dubious in light of the Supreme Court's apparent disavowals of it. *See Kemna*, 534 U.S. at 386 n.16 (acknowledging that certain commentators have described *Henry* as being "radical").

court denied the continuance, stating that he had to be with his hospitalized daughter the next day and had a trial scheduled the following week. *Kemna*, 534 U.S. at 381. The Missouri Court of Appeals affirmed the defendant's conviction, reasoning that his application for a continuance failed to comply with a state procedural rule because it was oral and unsupported by an affidavit. *Id.* at 372-73.

On appeal, the Supreme Court found that (1) the defendant had substantially complied with the continuance rule; (2) no published Missouri decision required perfect compliance; and (3) perfect compliance would not have changed the result since the trial judge indicated he had to visit his hospitalized daughter. *Id.* at 387. Accordingly, the defendant's perceived procedural default was not an adequate state ground to foreclose review over his Sixth Amendment claim. *Id.*

This case is unlike *Kemna*. Here, Hedrick did not substantially comply with Rule 5:17(c)'s requirement that he brief the *Brady* error set forth in his amended petition. Although he discussed the *Brady* issue at length in his petition, his mistaken belief that he was not required to brief the issue did not derive from a reasonable belief that the Supreme Court of Virginia had condoned that inaction. *See Wilson*, 357 F.3d at 466 (finding substantial compliance where the defendant made several objections to the discovery issue at trial and "only failed to make his claim on direct appeal after he received what he *reasonably believed* to be the blessing of the South Carolina Supreme Court"). Nor was his interpretation of "rulings below" as exclusively referring to the circuit court rulings sanctioned by the court in any manner. Moreover, Virginia cases require strict compliance with this rule. *See Kasi v. Commonwealth*, 508 S.E.2d 58, 60 (Va. 1998) (issues designated as assignments of error in petition but not briefed are waived); *Jenkins v. Commonwealth*, 423 S.E.2d 360, 364 (Va. 1992) (same). Finally, *Lenz* indicates that formally perfect compliance would have changed the Supreme Court of Virginia's disposition of the claim.

Because the default rule applied was thus adequate, we affirm the district court's dismissal of Hedrick's *Brady* claim on the basis of an adequate and independent state procedural rule foreclosing review.

We therefore do not reach the Warden's alternative assertion that this claim is frivolous.

HAMILTON, Senior Circuit Judge, writing for the court in Parts IV and V:

## IV.

Hedrick also claims that the district court erred when it dismissed his claim that he cannot be executed because he is mentally retarded as defined by Virginia law.

While Hedrick's state habeas petition was pending before the Virginia Supreme Court, the Supreme Court of the United States issued its decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), on June 20, 2002. In *Atkins*, the Court held that the Eighth Amendment prohibits the execution of the mentally retarded. *Id.* at 321. In so holding, the Court left to the states "the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.* at 317 (citation and internal quotation marks omitted).

Instead of seeking leave to amend his state habeas petition, *see* Rule 1:8 of the Rules of the Virginia Supreme Court ("leave to amend shall be liberally granted in furtherance of the ends of justice"), Hedrick elected to proceed to oral argument on September 10, 2002 without raising an *Atkins* claim. On November 1, 2002, the Virginia Supreme Court denied Hedrick's state habeas petition.

On December 2, 2002, Hedrick filed a petition for rehearing pursuant to Rule 5:39 of the Rules of the Virginia Supreme Court. On the last page of his ten-page petition, Hedrick suggested that his pre-trial IQ score of 76 "may support a diagnosis of mental retardation." He also suggested that, if he were found to be mentally retarded, his execution would violate *Atkins*. On January, 10, 2003, Hedrick's petition for rehearing was denied.

In his federal petition, Hedrick raised an *Atkins* claim, asserting that he could not be executed because he is mentally retarded. In rejecting this claim, the district court first held that the *Atkins* claim

was procedurally barred because Hedrick failed to take advantage of a viable opportunity to raise the claim on state habeas. According to the court, Hedrick was free to raise his *Atkins* claim by seeking leave to amend his state habeas petition but chose not to do so. Alternatively, the court held that Hedrick failed to put forth facts establishing an *Atkins* claim.

A.

In the interest of giving state courts the first opportunity to consider alleged constitutional errors occurring in a defendant's state trial and sentencing, a § 2254 petitioner is required to "exhaust" all state court remedies before a federal district court can entertain his claims. 28 U.S.C. § 2254(b) & (c); *see also Rose v. Lundy*, 455 U.S. 509, 518 (1982) (noting that "[t]he exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings"). Thus, a federal habeas court may consider only those issues which have been "fairly presented" to the state's highest court. *Picard v. Connor*, 404 U.S. 270, 275-78 (1971); *Spencer v. Murray*, 18 F.3d 237, 239 (4th Cir. 1994).

The exhaustion requirement, though not jurisdictional, *Granberry v. Greer*, 481 U.S. 129, 131 (1987), is strictly enforced, *Rose*, 455 U.S. at 522. Consequently, when a petition includes both exhausted and unexhausted claims, the district court must dismiss the entire petition. *Id.* However, the exhaustion requirement for claims not fairly presented to the state's highest court is technically met when exhaustion is unconditionally waived by the state, *Sweezy v. Garrison*, 694 F.2d 331, 331 (4th Cir. 1982) (*per curiam*), or when a state procedural rule would bar consideration if the claim was later presented to the state court, *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

Whether Hedrick's *Atkins* claim is exhausted turns on whether the claim was fairly presented to the Virginia Supreme Court on state habeas. We conclude that the claim was not fairly presented.

Under Virginia law, the Virginia Supreme Court has "exclusive jurisdiction" with respect to habeas petitions "filed by a petitioner held under the sentence of death." Va. Code Ann. § 8.01-654(C)(1).

Once a state habeas petition is pending before the Virginia Supreme Court, the court can order the circuit court which entered judgment to hold an evidentiary hearing. *Id.* § 8.01-654(C)(1). The hearing must be conducted within ninety days of the Virginia Supreme Court's order, and the circuit court has sixty days after the completion of the hearing to report its findings of fact and recommended conclusions of law to the Virginia Supreme Court. *Id.* § 8.01-654(C)(3). Any objection to the circuit court's report must be filed within thirty days of the date the report is filed in the Virginia Supreme Court. *Id.*

While a state habeas petition is pending before the Virginia Supreme Court, "[l]eave to amend shall be liberally granted in furtherance of the ends of justice." Rule 1:8 of the Rules of the Virginia Supreme Court. The Virginia Supreme Court has interpreted this rule to allow amendment unless the nonmovant would be prejudiced by the amendment. *Kole v. City Of Chesapeake*, 439 S.E.2d 405, 409 (Va. 1994). Moreover, unless a petitioner seeks leave to amend his state habeas petition, the court is without jurisdiction to entertain any additional claims in a new state habeas petition. *See Mallory v. Smith*, 27 F.3d 991, 995 (4th Cir. 1994) (applying Virginia law).

In this case, Hedrick did not avail himself of the mechanism in place to enable him to raise his *Atkins* claim on state habeas. To raise his *Atkins* claim, Hedrick should have sought leave to amend his state habeas petition. As noted above, amendment of a petition is the mechanism for raising additional claims while a state habeas petition is pending. For reasons unclear from the record, Hedrick chose not to seek leave to amend and, unquestionably, he had plenty of time to raise the claim before the Virginia Supreme Court heard oral argument in his case. By failing to follow established Virginia procedure, we are constrained to conclude that Hedrick's *Atkins* claim is not exhausted for purposes of federal habeas review because the claim was not fairly presented to the Virginia Supreme Court. *Cf.* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented"). To hold otherwise

would allow Hedrick to make an end run around state court review of his *Atkins* claim.[1]

Because Hedrick's *Atkins* claim is not exhausted for purposes of federal habeas corpus review, the claim must be dismissed unless the Commonwealth unconditionally waived exhaustion, *Sweezy*, 694 F.2d at 331, or a state procedural rule would bar consideration if the claim was later presented to the Virginia Supreme Court, *Coleman*, 501 U.S. at 735 n.1. The Commonwealth has not unconditionally waived exhaustion, so we are left with the question of whether a state procedural rule would bar consideration of this claim if it were presented to the Virginia Supreme Court.

In this case, Virginia law precludes consideration of Hedrick's mental retardation claim. Under Virginia Code Annotated § 8.01-654.1, capital habeas petitioners are limited to one state habeas petition filed within sixty days of the denial on direct appeal of the petitioner's petition for writ of certiorari with the United States Supreme Court. This section obviously is designed to encourage capital habeas petitioners to raise all viable claims in one habeas proceeding. *See also id.* § 8.01-654(B)(2) (generally prohibiting successive petitions); *id.* § 8.01-654.2 (prohibiting a petitioner who was sentenced to death before April 29, 2003 and has completed both a direct appeal and a state habeas proceeding from filing a successive petition raising an *Atkins* claim). Hedrick did not meet the goals of these statutes, as he failed to amend his state habeas petition. Because Hedrick cannot return to state court to file a new state habeas petition, his *Atkins* claim is procedurally barred.

---

[1]We note that our conclusion that Hedrick's *Atkins* claim is unexhausted is not altered by the fact that Hedrick raised an *Atkins* claim in his petition for rehearing of the denial of his state habeas petition. Raising a claim in a petition for rehearing does not fairly present the claim to the state's highest court. *See Lewis v. Sternes*, 390 F.3d 1019, 1031 (7th Cir. 2004) (noting that a petitioner "does not fully and fairly present a federal claim to the state courts when he raises that claim for the first time in a petition for rehearing before the state appellate court or in a petition asking the state supreme court to grant him leave to appeal"); *Cruz v. Warden of Dwight Corr. Ctr.*, 907 F.2d 665, 669 (7th Cir. 1990) (noting that raising a claim in a petition for rehearing to a state appellate court does not constitute fair presentment).

In his separate opinion dissenting in part and concurring in the judgment, Judge Gregory states that Hedrick's *Atkins* claim is not procedurally defaulted because Virginia Code Annotated § 8.01-654.2 "demonstrates Virginia's decision to decline her opportunity to first consider the *Atkins* claims of death-sentenced prisoners with Hedrick's procedural posture." *Post* at 40. According to Judge Gregory, § 8.01-654.2 "specifically contemplates" that Hedrick's *Atkins* claim "would be presented in federal court." *Post* at 40. Thus, Judge Gregory concludes, "the comity interests that would counsel against hearing Hedrick's claim are not implicated." *Post* at 40.

Section 8.01-654.2 provides an avenue for a Virginia prisoner who was sentenced to death before April 29, 2003 to raise an *Atkins* claim either on direct appeal or on state habeas. Va. Code Ann. § 8.01-654.2. If the prisoner has not commenced a direct appeal, he is directed to raise the claim on direct appeal. *Id.* Similarly, if the prisoner has not commenced his state habeas proceeding, he is directed to raise the claim in his state habeas petition. *Id.* If a direct appeal or a state habeas petition is pending at the time the prisoner desires to raise an *Atkins* claim, the prisoner is instructed to raise the claim by filing a supplemental brief in the case of an appeal or an amended petition in the case of a state habeas proceeding. *Id.* With regard to a prisoner who was sentenced to death before April 29, 2003 and who has completed both his direct appeal and state habeas proceeding, § 8.01-654.2 states that the prisoner will not be entitled to file "any further habeas petitions" and that "his sole remedy shall lie in federal court." *Id.*

With all due respect to Judge Gregory, there is nothing extraordinary about § 8.01-654.2 that calls into question our settled exhaustion and procedural default jurisprudence. The language of § 8.01-654.2 does not suggest that the Commonwealth is declining to entertain an *Atkins* claim that could have been raised prior to the denial of a prisoner's state habeas petition. Indeed, the statute encourages a prisoner whose state habeas petition is pending to raise an *Atkins* claim by way of an amended petition. Simply put, the "further habeas" petition and "sole remedy" language of § 8.01-654.2 indicates that an *Atkins* claim may not be raised in a successive petition and that any remedies that may exist for the successive claim lie in federal court. There is nothing extraordinary about this language, which unquestionably is con-

sistent with the Commonwealth's desire to have all claims that could have been raised in one habeas proceeding resolved in that proceeding. Failing to raise an *Atkins* claim by way of requesting leave to amend a state habeas petition, just like failing to raise any other claim that could have been timely raised on state habeas, subjects the claim to review under the principles of exhaustion and procedural default once the claim is presented in federal court. Here, Hedrick's *Atkins* claim is procedurally defaulted because Virginia law bars further consideration of a claim he did not fairly present to the state court when he clearly had the opportunity to do so.

Absent a fundamental miscarriage of justice, which Hedrick does not assert, we may not review procedurally barred claims "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. To establish cause, a petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). This requires a demonstration that "the factual or legal basis for the claim was not reasonably available to the claimant at the time of the state proceeding." *Roach v. Angelone*, 176 F.3d 210, 222 (4th Cir. 1999).

There is nothing in the record to suggest that Hedrick was impeded from amending his state habeas petition to include his *Atkins* claim. Thus, he cannot establish cause for the default. Accordingly, Hedrick's default cannot be excused.

## B.

Even if Hedrick could get around the procedural bar in this case, he would not be entitled to relief because his *Atkins* claim fails on the merits. As noted above, *Atkins* left to the states the task of "developing appropriate ways to enforce the constitutional restriction" on executing the mentally retarded. 536 U.S. at 317. The Virginia General Assembly responded by enacting its definition of "mental retardation" requiring, among other things, that the capital defendant's disability originate before the age of eighteen and be characterized by "significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning

administered in conformity with accepted professional practice, that is at least two standard deviations below the mean." Va. Code Ann. § 19.2-264.3:1.1(A). The Virginia Supreme Court, consistent with the standards of the American Psychiatric Association, has determined that this standardized measure corresponds to an IQ score of 70 or less. *Johnson v. Commonwealth*, 591 S.E.2d 47, 59 (Va. 2004), *vacated on other grounds*, 125 S. Ct. 1589 (2005). Thus, Hedrick is mentally retarded under Virginia law only if he establishes, among other requirements, that his intellectual functioning would have corresponded to an IQ score of 70 or less before he turned the age of eighteen. *Walker*, 399 F.3d at 320.[2]

The district court dismissed Hedrick's *Atkins* claim, concluding that "Hedrick points to no evidence that suggests that he is mentally retarded." Because the district court granted the Commonwealth's motion to dismiss, our review is *de novo*. *Walker*, 399 F.3d at 319. In resolving Hedrick's *Atkins* claim, we must determine whether Hedrick "has set forth facts that, if true, would demonstrate that he is mentally retarded under Virginia law." *Id.* at 320.

In support of his *Atkins* claim, Hedrick primarily relies on the April 22, 1998 pre-trial report of his mitigation expert, Dr. Gary Hawk, who at the time was an associate professor of clinical psychiatric medicine at the University of Virginia. In his report, Dr. Hawk noted that Hedrick received a score of 76 on a WAIS IQ test administered in anticipation of trial. According to Dr. Hawk, Hedrick's intellectual functioning was "below average but above the range indicative of mental retardation."[3] Dr. Hawk's report also states that Hedrick

---

[2]We note that a habeas petitioner is not required to submit an IQ score of 70 or less from a test taken before he turned the age of eighteen. *Walker v. True*, 399 F.3d 315, 323 n.7 (4th Cir. 2005). Nevertheless, the petitioner must allege that his intellectual functioning would have fallen below this standard before he turned the age of eighteen. *See* Va. Code Ann. §§ 19.2-264.3:1.1(A),(B)(3).

[3]At trial, Dr. Hawk testified on the question of IQ testing:

I conducted intelligence testing, and the results of that testing indicated that Mr. Hedrick's level of intellectual functioning is in the borderline range. His full scale IQ is seventy-six, and what

"seemed to put forth good effort on the WAIS-III test, but rejected Hedrick's contemporaneous scores on other psychological tests as invalid due to over-endorsement of items indicative of problems of symptomatology."[4] Hedrick posits that, when taking into account the standard error of measurement (SEM),[5] his true IQ score is somewhere between 71 and 81 and that this evidence, coupled with the evidence of Hedrick's poor performance in school, demonstrates that he is mentally retarded.

Recently, in *Walton v. Johnson*, No. 04-19, 2006 WL 561492 (4th Cir. March 9, 2006) (*en banc*), we held that, because the petitioner failed to allege sufficient facts demonstrating that his intellectual functioning was 70 or less before he turned the age of eighteen, the district court properly dismissed the petitioner's *Atkins* claim. *Id.* at *12-13. In that case, the petitioner alleged that he received an IQ score of 77 when his trial expert tested him a few months after he turned the age of eighteen. *Id.* at *12. According to the petitioner, his IQ should have been reduced to 74 because of the "Flynn Effect" and even lower because of the SEM. *Id.* at *12-13.[6] We rejected the peti-

---

we mean by that is that approximately ninety-five percent of folks who would take this test—and this test is the most well standardized intellectual assessment test that we have. Ninety-five percent of folks would score higher than Mr. Hedrick would. So these scores are below the average range. They are not so low as to suggest mental retardation, but they are far below average.

[4]The Commonwealth's trial expert, Dr. Evan Nelson, reviewed Dr. Hawk's test data and independently confirmed that Hedrick's IQ score was 76, which was in the fifth percentile, and opined that "mild depression may have caused his scores on some scales to be lower than his true potential." Dr. Nelson agreed that other testing results were invalid because Hedrick's "overendorsement of symptoms was intentional, and not the byproduct of lazy responding, illiteracy or mental confusion."

[5]The premise of the SEM is that IQ scores have a measurement error of plus or minus five points. *Walker*, 399 F.3d at 322.

[6]"The premise of the 'Flynn Effect' is that IQ scores increase over time and that IQ tests that are not re-normed to take into account rising IQ levels will overstate a testtaker's IQ score." *Walton*, 2006 WL 561492, at *12 n.22.

tioner's argument on the basis that the petitioner could only speculate that the SEM actually lowered his IQ score. *Id.* at *13.

As in *Walton*, only speculation on our part would lower Hedrick's IQ score of 76. As Hedrick concedes, the SEM could potentially increase his IQ score to 81. Moreover, for whatever reason (rightly or wrongly), Hedrick does not rely on the Flynn Effect to lower his IQ score. Considering Hedrick's failure to rely on the Flynn Effect, the fact that the SEM could either raise or lower Hedrick's IQ score, and the paucity of evidence indicative of mental retardation, we are constrained to conclude that Hedrick has not met his evidentiary burden with regard to his *Atkins* claim. *See id.* at *13 (holding that conclusory allegations did not preclude the dismissal of the petitioner's mental retardation claim); *cf. Johnson*, 591 S.E.2d at 59 (holding that the petitioner's *Atkins* claim was frivolous because the petitioner had received IQ scores of 75 and 78 and because his own expert witness stated that he was "not retarded"), *vacated on other grounds*, 125 S. Ct. 1589 (2005); *Morrisette v. Commonwealth*, 569 S.E.2d 47, 56 n.8 (Va. 2002) (rejecting an *Atkins* claim where the petitioner's IQ scores were 77 and 82 and where the evaluating psychiatrist opined that petitioner's intelligence was "roughly below average"). Accordingly, the district court's dismissal of Hedrick's *Atkins* claim is affirmed.

V.

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting in part from Part IV and concurring in the judgment only in Part V:

In Part IV, the majority concludes that Hedrick's claim that his execution is prohibited because he is mentally retarded must be dismissed because (1) it is procedurally barred and (2) he has failed to meet his evidentiary burden on the merits. With regard to the first basis, I disagree that the procedural default doctrine applies here to

preclude federal review, and I therefore respectfully dissent from Part IV.A. As to the second basis, although the recent decision in *Walton v. Johnson*, No. 04-19, 2006 WL 561492 (4th Cir. March 9, 2006) (*en banc*), compels me to concur in the ultimate disposition of Hedrick's claim in Part IV.B of the majority opinion, I write separately to voice my concern with this precedent.

## A.

The circumstances surrounding the timing of Hedrick's state habeas petition, the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), and Virginia's legislative response to *Atkins* present a highly unusual backdrop to Hedrick's claim of mental retardation. On June 20, 2002, as the proceedings in Hedrick's state habeas petition drew to a close, the United States Supreme Court issued its decision in *Atkins*, holding that the Eighth Amendment bars the execution of the mentally retarded. The Court neither defined mental retardation nor prescribed the method by which to raise such a claim, leaving these matters to the States. *Id.* at 317. By that time, Hedrick's Virginia habeas petition had been pending for more than two years, the state habeas evidentiary hearing was long over, and briefs had been filed. All that remained was oral argument, which the Supreme Court of Virginia held on September 10, 2002. The court issued its decision denying Hedrick habeas relief on November 1, 2002. Although Hedrick did not raise *Atkins* prior to this denial, he did assert that he was mentally retarded in his December 2, 2002 petition for rehearing to the Supreme Court of Virginia. Pet. for Reh'g 10, Dec. 2, 2002.[1] In a one-page order issued on January 10, 2003, the Supreme Court of Virginia denied rehearing and dismissed the petition without addressing Hedrick's request for expert assistance or his *Atkins* claim.

The Virginia legislature did not respond to *Atkins* until April 29, 2003, several months after the final ruling on Hedrick's petition. On that date, in addition to defining mental retardation, *see* Va. Code Ann. § 19.2-264.3:1.1, Virginia also enacted Virginia Code Annotated § 8.01-654.2, providing the procedures for the "[p]resentation of

---

[1] In the petition, he requested both an evidentiary hearing and the court's assistance in obtaining an expert assessment of his mental state.

claim of mental retardation by person sentenced to death before April 29, 2003." Under § 8.01-654.2, a prisoner with a pending state habeas petition may file an amended petition asserting a mental retardation claim, which must be considered as long as it is not frivolous. However, the statute provides that a petitioner such as Hedrick, who has "completed both a direct appeal and a habeas corpus proceeding . . . shall not be entitled to file further habeas petitions in the Supreme Court [of Virginia] and his sole remedy shall lie in federal court." *Id.* Thereafter, Hedrick filed his federal habeas petition in the district court, asserting his *Atkins* claim.[2]

Given this procedural history, the threshold question of this appeal is whether Hedrick's *Atkins* claim is exhausted for purposes of federal habeas review. The doctrine of exhaustion is designed to give state courts a "full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "This exhaustion requirement is . . . grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). The requirement of exhaustion is mandated by statute in the federal habeas context. *See* 28 U.S.C. 2254(b)(1). Federal courts may not grant an application for a writ of habeas corpus unless "(A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." *Id.*

Whether a claim is exhausted is tested at the time of the federal petition. *Gray v. Netherland*, 518 U.S. 152, 161 (1996). As the majority recognizes, the exhaustion requirement is met if a state rule would now prevent future consideration of the claim. *Id.* At the time Hedrick filed his habeas petition in the district court, Virginia law foreclosed him from later bringing his *Atkins* claim in the Commonwealth. Specifically, the newly enacted Virginia statute addressing mental retar-

---

[2]Hedrick appears to be the only death-sentenced Virginia prisoner whose Virginia habeas petition was pending when *Atkins* was decided, but whose proceedings were complete by the April 29, 2003 effective date of the statute.

dation claims provides that an individual sentenced to death before April 29, 2003, whose Virginia proceedings are complete "shall not be entitled to file any further habeas petitions in the Supreme Court [of Virginia] and his sole remedy shall lie in federal court." Va. Code Ann. § 8.01-654.2. Therefore, Hedrick's *Atkins* claim is exhausted by this law.

Ordinarily, when exhaustion occurs because a state rule bars future state consideration of a federal habeas petitioner's claim, the related doctrine of procedural default applies to preclude federal review. This is because, in the usual case, it is the petitioner's failure to follow state procedures that causes the state rule to bar consideration. In other words, the petitioner has procedurally defaulted on his claim. In such a circumstance, comity instructs that we decline to consider the claim out of respect for the state procedural rule that the petitioner violated. *See Dretke v. Haley*, 541 U.S. 386, 392-93 (2004) (a procedural default "provides only a strong prudential reason, grounded in 'considerations of comity and concerns for the orderly administration of justice,' not to pass upon a defaulted constitutional claim presented for federal habeas review." (quoting *Francis v. Henderson*, 425 U.S. 536, 538-39 (1976)).

Here, however, the procedural default doctrine does not apply. Virginia Code Annotated § 8.01-654.2 does not foreclose Virginia review due to any failure to follow state procedures. Rather, as of the April 29, 2003 effective date of the statute, the only condition necessary to preclude Virginia's consideration is that the death-sentenced prisoner's Virginia proceedings be complete. This does not create or even suggest an intent to bar the claim for a procedural default. To the contrary, the statute demonstrates Virginia's decision to decline her opportunity to first consider the *Atkins* claims of death-sentenced prisoners with Hedrick's procedural posture. The statutory language specifically contemplates that those claims would be presented in federal court. With Hedrick's claim thus exhausted by the choice of the Virginia legislature, rather than by a procedural default, the comity interests that would counsel against hearing Hedrick's claim are not implicated.

The majority's analysis goes astray in construing a procedural default out of Virginia's statute authorizing only a single habeas peti-

tion filed within sixty days of the resolution of the individual's direct appeal. The majority reasons that Hedrick's failure to seek leave from the Supreme Court of Virginia to amend his petition under Rule 1:8 constituted a default under this law. However, I believe that the Supreme Court of Virginia would apply—as I have done above—§ 8.01-654.2, which specifically addresses the procedures for raising *Atkins* claims. *See Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375-76 ("It is an elementary tenet of statutory construction that '[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one . . . .'" (quoting *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974))). Hedrick is a "person sentenced to death before April 29, 2003" who seeks to present a "claim of mental retardation." *See* Va. Code Ann. § 8.01-654.2. As such, § 8.01-654.2 is the provision of the law specifically applicable to him. This provision on its own plainly forecloses review in Hedrick's particular circumstance. We need not speculate, as the majority does, about the applicability of the single habeas petition statute or any other Virginia law.

In addition, even following the strained reasoning of the majority, I would not conclude that Hedrick's failure to seek leave to amend his petition under Rule 1:8 constituted a federally cognizable default. Virginia's legislative response to *Atkins* belies the notion that seeking leave to amend through Rule 1:8 is required to avoid default in these circumstances. Specifically, through § 8.01-654.2, an individual whose habeas petition is still pending as of April 29, 2003, may raise a mental retardation claim as a matter of right without regard to any earlier failure to seek leave to amend his petition under Rule 1:8. *See* Va. Code Ann. 8.01-654.2. Thus, § 8.01-654.2 faults no death-sentenced prisoner for failing to attempt to raise a claim of mental retardation between the June 20, 2002 decision date of *Atkins* and the April 29, 2003 effective date of the statute. The fact that the Virginia General Assembly created this new procedure to add mental retardation claims suggests that the legislature did not expect that petitioners would have already used Rule 1:8 for that purpose, let alone that the General Assembly had any intent to penalize them for failing to employ it. The majority's approach is therefore inconsistent with Virginia's treatment of other *Atkins* claimants whose petitions were pending when *Atkins* was decided.

For these reasons, I would hold that Hedrick's *Atkins* claim is exhausted, but not defaulted. As such, there is no doctrine that precludes federal review. To the contrary, Virginia has indicated that such claims should be heard and that federal court is the appropriate forum. We thus best respect Virginia law and the interests of justice by reaching the merits of Hedrick's claim. Therefore, I respectfully dissent from the majority's conclusion that Hedrick's *Atkins* claim is procedurally barred.

### B.

In the alternative, the majority holds that Hedrick's claim that he is mentally retarded fails because he has not met his evidentiary burden on the merits. Because of the recent decision in *Walton v. Johnson*, No. 04-19, 2006 WL 561492 (4th Cir. March 9, 2006) (*en banc*), I must concur that Hedrick's claim must be dismissed. I am concerned, however, that this precedent prevents potentially viable claims from development and consideration in federal court.

Under *Walton*, it is not enough for a petitioner claiming that he is mentally retarded to produce an IQ score that is within the standard error of measurement of scores indicative of mental retardation. *See id.* at *13. Rather, the petitioner must support his allegation with a mental health expert's opinion that the standard error of measurement should be applied to *lower* his IQ score. *See id.* Thus, even where a petitioner has had no opportunity to develop the factual basis for his claim in state court, he must marshal expert support for an apparently viable claim even at the motion to dismiss stage.

I concurred with the dissent in *Walton* in finding no basis in Virginia law or elsewhere for this heightened evidentiary hurdle. *See id.* at *25 n.5 (Wilkins, C.J., dissenting) (dissenting for the reasons stated in Judge Motz's panel opinion in *Walton v. Johnson*, 407 F.3d 285, 294-97 (4th Cir. 2005)). In addition, Hedrick's case illustrates my concern with the *Walton* rule. Hedrick's IQ score of 76 is the same score received by the Virginia petitioner in *Walker v. True*, 399 F.3d 315, 322 (4th Cir. 2005). In *Walker*, we recognized that an IQ score of 76 can support a claim of mental retardation and therefore ordered an evidentiary hearing. *Id.* at 322-23. In that case, the petitioner had produced expert opinions stating that the standard error of measure-

ment and the Flynn Effect should apply to lower his score to 70 or below. *Id.* Here, Hedrick requested expert assistance and an evidentiary hearing in his petition to the district court to similarly support and develop his claim, but has received neither.[3] As a result, Hedrick has not yet been able to proffer an appropriate level of manipulation based on the standard error of measurement, or yet been able to determine the applicability of the Flynn Effect, which could reduce his IQ score to 70 or below.

Because Hedrick has not produced expert support at this stage, *Walton* requires that Hedrick's claim be dismissed. Although I am bound by this precedent, I find it troubling that despite the fact that Walker and Hedrick are from the same state and have the same IQ, Hedrick's allegations of mental retardation are found to lack merit essentially for his failure to prove them at this stage. Hedrick seeks only to develop and be heard on what is, under *Walker*, a demonstrably colorable claim. The potential exists for great and irreversible harm in denying him that opportunity, for in death penalty cases, the results of such decisions are final.

Under *Walker*, it is clear that Hedrick could be mentally retarded. As a result of today's decision, we allow the execution of a man whose death sentence might be unconstitutional without a full and fair consideration of his claim. Although the manifest unfairness of this result gives me great concern, I am bound by *Walton* to concur in the judgment.

---

[3]Section 848(q) of Title 21 of the U.S. Code provides that in capital habeas cases, the court may authorize investigative and expert services that are "reasonably necessary for the representation of the defendant" and order the payment of fees and expenses therefor. 21 U.S.C. 848(q)(9). Likewise, Virginia law would require court appointment of a qualified expert to assess whether or not the defendant is mentally retarded where a defendant with a non-frivolous mental retardation claim is unable to afford such expert assistance. Va. Code Ann. 19.2-264.3:1.2.