PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DARICK DEMORRIS WALKER,

*Petitioner-Appellant,*

v.

LORETTA K. KELLY, Warden,
Sussex I State Prison,

*Respondent-Appellee.*

No. 06-23

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Senior District Judge.
(1:03-cv-00764-CMH)

Argued: September 22, 2009

Decided: January 27, 2010

Before TRAXLER, Chief Judge, and GREGORY and
SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Shedd wrote the opinion, in which Chief Judge Traxler joined. Judge Gregory wrote a separate opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED**: Jody Manier Kris, WILMERHALE, Washington, D.C., for Appellant. Steven Andrew Witmer, OFFICE OF

THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Amy Oberdorfer Nyberg, Susan S. Friedman, Jeremy D. Dresner, WILMERHALE, Washington, D.C., for Appellant. Robert F. McDonnell, Attorney General of Virginia, Jerry P. Slonaker, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

---

**OPINION**

SHEDD, Circuit Judge:

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment prohibits the execution of mentally retarded persons. Relying on *Atkins*, Virginia capital inmate Darick Demorris Walker filed a petition for federal habeas corpus relief seeking to prevent his execution. Finding that Walker failed to prove that he is mentally retarded under Virginia law,[1] the district court denied the petition, and he now appeals. For the following reasons, we affirm the judgment of the district court.

I

In 1998, the Commonwealth of Virginia convicted Walker of capital murder for the killings of two men within a three-year period. Walker was sentenced to death, and his conviction and capital sentence were affirmed. *Walker v. Commonwealth*, 515 S.E.2d 565 (Va. 1999), *cert. denied*, 528 U.S. 1125 (2000). The underlying facts of his crimes, which are not pertinent to this appeal, are set forth in the state supreme court's opinion. *See* 515 S.E.2d at 568-69.

---

[1]"While Walker's claim ultimately derives from his rights under the Eighth Amendment, whether he is mentally retarded is governed by Virginia law." *Walker v. True*, 399 F.3d 315, 319 (4th Cir. 2005) ("*Walker v. True II*").

After unsuccessfully pursuing state post-conviction relief, Walker filed the first of two petitions for habeas corpus relief in the district court. The claims involved in Walker's first habeas petition are not before us in this appeal. *See Walker v. Kelly*, No. 08-11 (4th Cir. Dec. 16, 2009) (affirming the denial of Walker's first habeas petition).

While Walker's first habeas petition was pending in the district court, the Supreme Court decided *Atkins*. Concluding that a national consensus had developed against the execution of the mentally retarded, the Court held that the Eighth Amendment bars their execution. In doing so, the Court noted:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. . . . Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.

*Atkins*, 536 U.S. at 317. However, the Court "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall" within the class of defendants ineligible for capital punishment. *Bobby v. Bies*, 129 S.Ct. 2145, 2150 (2009) (internal punctuation omitted). Instead, the Court expressly left to the states the "'task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Atkins*, 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)). "States . . . have responded to that challenge by adopting their own measures for adjudicating claims of mental retardation." *Schriro v. Smith*, 546 U.S. 6, 7 (2005).

The Virginia General Assembly responded to *Atkins* by enacting a statutory scheme to determine capital defendants'

claims of mental retardation. Pertinent to this case, the General Assembly mandated that a capital defendant has the burden of proving mental retardation by a preponderance of the evidence, Va. Code § 19.2-264.3:1.1(C), and it defined the term "mentally retarded" as:

> [A] disability, originating before the age of 18 years, characterized concurrently by (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

Va. Code § 19.2-264.3:1.1(A). For a capital defendant (such as Walker) who had completed his direct appeal and state habeas proceeding as of the effective date of the legislation, the General Assembly specified that "he shall not be entitled to file any further habeas petitions in the [Virginia] Supreme Court and his sole remedy shall lie in federal court." Va. Code § 8.01-654.2.

Walker initially presented his *Atkins* claim in his appeal from the denial of his first federal habeas petition. Construing his *Atkins* claim in that appeal as a motion for authorization to file a successive habeas corpus petition, we granted Walker authorization. *See Walker v. True*, 67 Fed. Appx. 758, 770-71 (4th Cir.) ("*Walker v. True I*"), *vacated on other grounds*, 540 U.S. 1013 (2003). Walker then filed his second federal habeas petition (which is now before us), and the Commonwealth moved to dismiss that petition. The district court granted the Commonwealth's motion and entered judgment against Walker.

On appeal, we vacated the judgment, concluding that the district court erred by dismissing the petition without holding

an evidentiary hearing; consequently, we remanded the case for an evidentiary hearing to address whether Walker is mentally retarded under Virginia law. *See Walker v. True II*, 399 F.3d at 327. However, although we ruled in Walker's favor concerning his right to have an evidentiary hearing, we rejected his contention that he was entitled to have a jury decide whether he is mentally retarded. As we explained:

> [T]he portion of the Virginia statute that refers to a jury determination does so in the context of the appropriate procedure at sentencing in state court. It does not bear on the appropriate federal procedure governing Walker's Eighth Amendment claim that is based, in part, upon Virginia's definition of mentally retarded.

399 F.3d at 324-25.

On remand, the district court held a multi-day evidentiary hearing without a jury, during which the parties introduced a substantial amount of evidence on the issue of Walker's mental retardation. This evidence included Walker's scores on various standardized tests; documentary evidence from school, prison, and medical records; and declarations from his family, acquaintances, and fellow inmates. The court also heard testimony from several witnesses, including designated experts who testified on the issue of Walker's mental retardation. Eventually, the court denied Walker's petition. This appeal followed.

II

In accordance with Virginia law, Walker presented his *Atkins* claim only in federal court; therefore, the standard of review mandated by AEDPA does not apply. *See Walker v. True II*, 399 F.3d at 319. Instead, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *Green v. Johnson*, 515 F.3d 290, 301 (4th Cir.),

*cert. denied*, 128 S. Ct. 2999 (2008). Because the determination of mental retardation involves a question of fact, *Atkins v. Commonwealth*, 631 S.E.2d 93, 98 (Va. 2006), we review the district court's finding that Walker is not mentally retarded for clear error, *Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009). When we review factual findings under this standard,

> Our scope of review is narrow; we do not exercise de novo review . . . or substitute our version of the facts for that found by the district court. Instead, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Thus, facts found by the district court are conclusive on appeal "unless they are plainly wrong." A factual finding by the district court may be reversed only if, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

*Walton v. Johnson*, 440 F.3d 160, 173-74 (4th Cir. 2006) (en banc) (citations omitted).

### A.

To prevail on his *Atkins* claim under Virginia law, Walker must meet the comprehensive definition of the statutory term "mentally retarded." *Green*, 515 F.3d at 298. Thus, he must prove by a preponderance of the evidence that he has a disability that originated before the age of 18, and that the disability is characterized by (1) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at

least two standard deviations below the mean ("the I.Q. prong") *and* (2) significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills ("the adaptive prong"). Although Walker devotes much of his appeal to the district court's analysis of the I.Q. prong, it is unnecessary for us to address those arguments because we conclude that the court did not clearly err in rejecting his claim on the adaptive prong. *See Green*, 515 F.3d at 301 (recognizing that the failure to prevail on the adaptive prong necessarily defeats an *Atkins* claim).

As noted, the adaptive prong focuses on whether a person can prove "significant limitations in adaptive behavior" and it measures such behavior by looking to the person's conceptual, social, and practical adaptive skills. Conceptual adaptive skills "involve skills pertaining to language, reading and writing, money concepts, and self-direction;" social adaptive skills "are measured by interpersonal skills and responsibility, self-esteem, gullibility and naivete, and ability to follow rules and obey laws;" and practical adaptive skills "involve activities relevant to daily living, occupational skills, and maintenance of a safe environment." *Green*, 515 F.3d at 302.[2] During the evidentiary hearing the parties presented a substantial amount of evidence pertaining to Walker's adaptive behavior. We now turn to a brief summary of that evidence.

(1)

As evidence of his conceptual limitations, Walker pointed to his difficulties reading and writing. He presented evidence that "he never reads or looks at books or magazines," J.A. 310, and he also claimed that he relies on other inmates to help him read, write, and fill out forms. Moreover, affidavits from family members note that Walker would ask others to

---

[2]These definitions come from the American Association of Mental Retardation's standards for measuring adaptive skills. *See Green*, 515 F.3d at 302.

read letters to him, and his brother's affidavit related a particularly telling moment: "When I was in Ninth grade and Darick was seventeen years old, I remember coming back from school to find Darick at home with a bunch of blank job applications. I had to fill them out for him." J.A. 159.

Walker also pointed to his inability to handle money and his heavy reliance on others to get by in the world. His family members noted that, while growing up, Walker never knew what to do with money. Moreover, his fellow inmates claimed that he relies on them for help in maintaining his account with the prison commissary. His experts also observed that "[a]fter leaving home, Mr. Walker consistently relied on others to help him negotiate the basics of everyday life," J.A. 378, and that even in prison he is dependent on others to "support and intercede on his behalf," J.A. 313. There was also evidence that Walker relies on others for help in seeking medical attention.

Finally, Walker pointed to evidence of his lack of direction and inability to deal with unstructured time. He claimed that he lacks interest in any activities, other than watching television. During interviews with his experts, Walker could not state who the President of the United States was, had not heard of Hurricane Katrina (which had just recently occurred), and misstated his age as 32 when he had in fact turned 33 two months prior.

The Commonwealth took a different tack with respect to Walker's conceptual skills. While admitting that Walker possessed conceptual skills that are "below average," the Commonwealth's expert, Dr. Hagan, opined that these limitations "did not significantly impair his capacity to adapt to the requirements of life including transportation, use of communication technology, planning, scheming, dealing with reasonably foreseeable contingencies, self advocacy, self-protective mechanisms, and selective portrayal of facts and circumstances." J.A. 977. In support of this assertion, the Common-

wealth and Dr. Hagan pointed to several events that purport to showcase Walker's conceptual skills.

In particular, the Commonwealth focused on Walker's extensive criminal history as evidencing his conceptual abilities. The Commonwealth referenced a fraudulent scheme concocted by Walker, whereby he arranged to sell a vehicle to an individual, told the individual that some money was needed to correct problems with the title, and absconded with the money. Dr. Hagan opined:

> This conduct clearly demonstrates Mr. Walker's capacity to develop a plan, consider various contingencies in connection with that plan, promote the plan to an unsuspecting person, and pull off the ruse by affecting [sic] his departure without being detected at least for the time being. He not only had to put the plan together, but also had to fool his victim into going along with the plan without arousing suspicion. This reflects considerable conceptual capabilities.

J.A. 978.

Dr. Hagan also considered how Walker reacted when he was being investigated for an armed robbery and drew the following conclusions:

> Mr. Walker gave a statement to law enforcement on 3/2/93 (age 20) in connection with the Virginia Beach Armed Robbery charge. Mr. Walker had sufficient conceptual grasp of his situation to deny any involvement in or knowledge of the offense. This was designed to protect his liberty interest. After [a law enforcement official] advised Mr. Walker of additional information provided by a witness, Mr. Walker then made an adjustment in his story to deal with this contingency. This reflects a degree of exec-

utive functioning and conceptual reasoning in that Mr. Walker had entered the interview with one strategy in mind and then changed that strategy based on immediately unfolding circumstances. He then gave a written statement which, although marked by misspelling and grammatical error, reflected a linear thought process with no oddities or illogical reasoning. The statement, which if believed, would have furthered his liberty interest.

J.A. 985. The Commonwealth also introduced court transcripts that contain examples of Walker testifying as to historical events and even correcting prosecutors as to the timeline of his various arrests.

In addition, the Commonwealth presented evidence of Walker's ability to read and write. For example, the Commonwealth provided several examples of Walker's writing ability, including prison forms and the written statement that he prepared in connection with an armed robbery charge. Dr. Hagan noted Walker's admission that he would use a fellow inmate to write letters, not because "I cannot find the words," but because "it's easier for him to do it." J.A. 979. Thus, according to Dr. Hagan, Walker's reason for having others write letters for him was less a matter of inability and more a matter of convenience.

(2)

In attempting to prove significant limitations in his social skills, Walker presented evidence that he is a loner who has always had difficulties maintaining appropriate relationships with his peers. In particular, Walker presented school records replete with observations of his social and behavioral difficulties. His records describe his behavior variously as "aberrant," "inappropriate," "disruptive," and "deviant." J.A. 607, 609, 613, 1073. One report from Walker's school years notes that he would "threaten[] smaller children and tease[] other stu-

dents cruelly." J.A. 607. Walker also presented evidence that this anti-social behavior continues to this day, in the form of affidavits from fellow inmates that he will flood his cell when he gets upset.

However, the Commonwealth presented its own evidence suggesting that Walker's deficits in social skills are not significant. First, although Walker's school records generally indicate his difficulties getting along with peers at school, other records from the same time period suggest that he was capable of developing and maintaining social relationships outside of the classroom. For example, his mother's responses to a 1987 Virginia Department of Education Social Behavior Checklist indicate that Walker had "plenty of friends" and got along well with adults. J.A. 1064. Among his favorite activities, his mother listed "sports, church activities and talking to adults." J.A. 1067. Moreover, a 1983 psychiatric evaluation noted:

> There is no history of school avoidance or separation difficulties. Patient states that in classroom he is made fun of and called "retarded" by his classmates. He states that they get jealous when he makes 100's and they get C's and D's on their tests. He states that they will not let him play any games with them and so then goes to play with the sixth graders. He and his mother both report that he is able to get along with neighborhood children without problems. He and his mother both report that he is the "class-clown" and this may bring some attention to him in addition to his hyperactive type behavior in the classroom and might set him up to be the scape-goat.

J.A. 1076-77. Further, some of Walker's school records indicate his ability to maintain appropriate social intercourse. Classroom reviews from 1987 note his "very appropriate classroom behavior" and his ability to "get[] along with his peers." J.A. 1097.

Additionally, Dr. Hagan pointed to reports from prison officials of Walker's behavior as indicative of social skills. Prison officials reported that Walker never had difficulty communicating his needs and interests and was cordial and conversational. Prison mental health services screenings of Walker note that he was clean, cooperative, and capable of engaging in "extensive conversations about family [and] security complaints." J.A. 1435. His behavior during these screenings was variously described as "polite" and "cooperative." J.A. 1435, 1438, 1441, 1444. Moreover, Dr. Hagan noted Walker's ability to ingratiate himself to women and establish intimate relationships with them in a relatively short period of time as evidence of his social skills.

(3)

Walker presented evidence suggesting that he suffers from limitations in his practical adaptive skills. For example, he pointed to evidence that he is incapable of performing the basic tasks incidental to an independent life, such as renting an apartment, managing money, and paying bills. His mother's affidavit portrays him as a man who "just wouldn't have been able to read and understand a bill or a lease," J.A. 156, and his brother averred that Walker "never knew how to handle money," J.A. 159. The Commonwealth's expert agreed that there is no evidence that Walker ever had a bill in his name.

Walker also introduced evidence that he was unable to obtain a driver's license and was wholly dependent on others for transportation. His brother averred that Walker "never had a driver's license. I never saw him take a public bus. If Darick wanted to get somewhere, me or another relative would have to drive him." J.A. 159. Another relative stated that Walker "had a tough time understanding easy directions. I used to work straight down the street from my apartment. I told Darick exactly how to get from one place to the other, but he

couldn't find his way home even though it was right down the street." J.A. 864.

Finally, Walker put forth evidence that he has a very limited job history and was unable to maintain steady employment prior to his incarceration. According to one of his experts, Walker "did not have a regular job or even stable part-time employment." J.A. 311. Walker's expert considered these facts important because "[a] critical adaptive behavior domain for adults is employment and self-support." J.A. 310.

On the other hand, the Commonwealth presented a considerable amount of evidence illustrating Walker's practical skills. For example, the Commonwealth presented Walker's own testimony from his 1998 trial for armed robbery. That testimony included the following exchanges:

> Q: And when you were stopped by Officer Hamilton, you were coming out of 3404 Howard Road?
>
> A: Yes, I was, that's my apartment number.
>
> ***
>
> The Court: Mr. Walker, how did you get from Richmond down to Chesapeake?
>
> Witness Derrick [sic] Walker: Well, sir, um, the person's car that I had, I returned the car, and that person wanted to know why did I want a ride to the Tidewater area. I explained to that person what I had did. I just didn't want to take the car and go to the Tidewater area and then have that person without a car, so she gave me a ride and dropped me off at my brother's house.

J.A. at 1296, 1300. According to Dr. Hagan, these exchanges showcased Walker's ability to remember addresses, his ability

to make his way from one place to another, and his ability to drive. Dr. Hagan also pointed to records from Walker's case file on his carnal knowledge conviction that relate instances of Walker driving a car, using a pager, and renting a hotel room.

In addition, Dr. Hagan testified as to his interviews with one of Walker's girlfriends, Kelly Walker White. Ms. White related that Walker shared an apartment with her for a period of time, during which Walker babysat her son, cared for the apartment, and cooked from scratch. During the evidentiary hearing, Dr. Hagan gave the following testimony:

> And it wasn't just that he took on these tasks, he did them effectively, he did them repeatedly, he did them consistently. She would come home from work, the child was clean, was dressed, was pow-dered, bathed and not with a whimper of discontent from the child, and dinner was ready. And she was very pleased to have his able assistance.

J.A. 1876.

Moreover, Dr. Hagan noted that, with respect to Walker's employment history, there was no evidence that Walker was ever discharged from employment due to an inability to per-form the duties of the job. In his report, Dr. Hagan observed:

> Although his experts declare that Mr. Walker was not able to secure and maintain a job, his own state-ment is that he found several jobs, but quit them at his own election, just as he quit Job Corps. He left because he did not have family support. . . . He said he left Long John Silver in Richmond after 7-8 months because he wanted to go home and help his mother who had an unconfirmed heart condition. This was voluntary unemployment.

J.A. 1018. Dr. Hagan went on to explain that "[Walker's] elected lifestyle, including chronic involvement in criminal activities, did not lend itself to mainstream employment, but there was no indication of an actual inability in that regard." J.A. 1019-20.

Finally, there is evidence in the record tending to show that Walker is able to adequately care for himself. For example, Walker washes his own clothing in prison in order to avoid skin irritation which he attributed to the soap used in the prison laundry. Dr. Hagan's report also relied on statements from prison officials that they had never observed hygiene problems with regard to Walker and that Walker had never had any trouble communicating his needs and concerns to prison officials.

### B.

Ultimately, four experts testified that Walker's skills limitations are significant, basing their conclusions on school and medical records, clinical interviews, prior psychological evaluations, declarations from individuals familiar with Walker, and other records concerning his background, as well as the results of a standardized measure called the Adaptive Behavior Assessment System, second edition ("ABAS-II"). In contrast, the Commonwealth's expert, Dr. Hagan, testified that Walker does not suffer from significant limitations in his adaptive behavior. He based his conclusions on "[a] clinical interview with a collateral informant, review of interview summaries by trial defense investigators and mitigation specialist, in-person observation of Walker's interviews with three psychologists on two occasions, numerous reports of psychological testing including IQ scores as well as [a] review of educational, correctional and vocational records." J.A. 976. In his report, Dr. Hagan also concluded that Walker's experts' reliance on the ABAS-II to determine Walker's adaptive behavior was not "sound practice." J.A. 977.

Apparently crediting Dr. Hagan's testimony over Walker's experts' testimony, the district court concluded that Walker failed to meet his burden of showing significant limitations in his adaptive behavior:

> Petitioner has failed to show by a preponderance of the evidence that he has "significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." *See* Va. Code Ann. § 19.2-264.3:1.1(A). While Petitioner has presented evidence that he suffers from below average mental intelligence, struggles to perform some basic activities, exhibits anti-social behavior, and obtains financial support from others, Petitioner has not shown by a preponderance of the evidence that he has significant limitations in adaptive behavior. Petitioner has committed various crimes requiring the ability to relate to others, associated himself with women on a personal and intimate level, engaged in homemaking activities, seduced under-aged girls, used others to help him avoid authorities, independently invoked his *Miranda* rights, used his brother's identity to obtain a driver's license, and obtained goods for himself while in prison. Therefore, while [P]etitioner has below average mental intelligence and some limitations in adaptive behavior, the Court finds that Petitioner has not shown by a preponderance of the evidence that he is mentally retarded as defined by Virginia law.

J.A. 2370-71.[3]

---

[3]That the district court set forth these factual findings under the heading "Conclusions of Law" is immaterial to our review. *See Tri-Tron Int'l v. Velto*, 525 F.2d 432, 435 (9th Cir. 1975) ("The fact that the district court intermingled some of its findings of fact with its conclusions of law is of no significance. We look at a finding or a conclusion in its true light, regardless of the label that the district court may have placed on it.").

In challenging these findings as being clearly erroneous, Walker argues that the district court's holding "could only result from a complete failure to consider his overwhelming proof, appropriately weigh it, and make specific findings to explain the basis for its ruling." *Brief for Appellant Darick Demorris Walker*, at 16. He further contends that the court's "general findings . . . lack evidentiary support and are consistent with the definition of mental retardation." *Id.* We find no merit to these contentions.

As we have summarized above, the district court was presented with conflicting evidence concerning Walker's adaptive skills, and it had the opportunity to assess the various witnesses who testified. Unfortunately for Walker, the court was not persuaded by his evidentiary presentation, and it concluded that he failed to meet his burden of proving the necessary fact that he suffers from *significant* limitations in adaptive behavior.[4] Although the court's finding in this regard may not be compelled by the evidence in the record, there is certainly evidence in the record to support it. Applying our limited standard of appellate review, we cannot conclude on the record presented that the court clearly erred. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *see e.g.*, *Green*, 515 F.3d at 301-03 (affirming district court's finding that the petitioner failed to prove significant

---

[4]To the extent that Walker challenges the adequacy of the district court's findings, we find no error. The district court listed the characteristics that it felt militate against finding that Walker met his burden. The court noted Walker's criminal history, his social relationships, his practical skills, and his ability to navigate the prison environment, among other evidence, as supporting its judgment. Moreover, the court heard from competing experts, and its decision suggests that it credited the testimony of the Commonwealth's expert over those of Walker.

limitations in adaptive behavior under Virginia law notwith-
standing conflicting evidence).[5]

### III

Walker also claims that he was entitled to a jury determina-
tion of his mental retardation and that the district court erred
by failing to empanel a jury. Although we previously rejected
this claim in *Walker II*, he contends that our prior decision is
erroneous based on what he perceives to be an intervening
change in the law. We disagree.

Section 8.01-654.2 of the Virginia Code sets forth the
framework for the resolution of *Atkins* claims filed by peti-
tioners, like Walker, who were sentenced to death before
April 29, 2003. It provides:

> Notwithstanding any other provision of law, any per-
> son under sentence of death whose sentence became
> final in the circuit court before April 29, 2003, and
> who desires to have a claim of his mental retardation
> presented to the Supreme Court, shall do so by one
> of the following methods: (i) if the person has not
> commenced a direct appeal, he shall present his
> claim of mental retardation by assignment of error
> and in his brief in that appeal, or if his direct appeal
> is pending in the Supreme Court, he shall file a sup-

---

[5]We also are unpersuaded by Walker's contention that the judgment
must be reversed because mentally retarded individuals are capable of
exhibiting many of the skills that the district court relied on when it made
its finding that he is not mentally retarded. As noted, Walker bore the bur-
den of proving significant limitations in adaptive behavior, and he unsuc-
cessfully attempted to meet that burden during the evidentiary hearing. As
we view his argument, he now implicitly argues that the Commonwealth
had some obligation to establish that he does not suffer from significant
limitations in adaptive behavior. However, we rejected that view in
*Walker II*. *See* 399 F.3d at 326 ("The state does not have a corollary duty
to prove that a defendant is 'not retarded. . . .'").

plemental assignment of error and brief containing his claim of mental retardation, or (ii) if the person has not filed a petition for a writ of habeas corpus under subsection C of § 8.01-654, he shall present his claim of mental retardation in a petition for a writ of habeas corpus under such subsection, or if such a petition is pending in the Supreme Court, he shall file an amended petition containing his claim of mental retardation. A person proceeding under this section shall allege the factual basis for his claim of mental retardation. The Supreme Court shall consider a claim raised under this section and if it determines that the claim is not frivolous, it shall remand the claim to the circuit court for a determination of mental retardation; otherwise the Supreme Court shall dismiss the petition. The provisions of §§ 19.2-264.3:1.1 and 19.2-264.3:1.2 shall govern a determination of mental retardation made pursuant to this section. If the claim is before the Supreme Court on direct appeal and is remanded to the circuit court and the case wherein the sentence of death was imposed was tried by a jury, the circuit court shall empanel a new jury for the sole purpose of making a determination of mental retardation.

If the person has completed both a direct appeal and a habeas corpus proceeding under subsection C of § 8.01-654, he shall not be entitled to file any further habeas petitions in the Supreme Court and his sole remedy shall lie in federal court.

Va. Code Ann. § 8.01-654.2.

We explained in *Walker II* that on its face "the Virginia statute does not provide for a jury for claims raised in federal court." 399 F.3d at 324. We also held that § 19.2-264.3:1.1(C), which provides that "in any case in which the offense may be punishable by death and is tried before a jury,

the issue of mental retardation . . . shall be determined by the jury as part of the sentencing proceeding," does not entitle Walker to a jury determination because that section's reference to a jury determination is "in the context of the appropriate procedure at sentencing in state court." *Id.* at 324-25.

Walker now argues that a subsequent Virginia case, *Burns v. Warden of Sussex I State Prison*, 609 S.E.2d 608 (Va. 2005), constitutes an intervening change in the law that establishes his right to a jury. The issue in *Burns* was whether the jury provisions of § 19.2-264.3:1.1 apply to a determination of mental retardation when the *Atkins* claim is brought in a state habeas corpus proceeding. Specifically, in *Burns* the Commonwealth argued that § 8.01-654.2 only provides for a jury determination of an individual's mental retardation claim when that claim is raised to the Virginia Supreme Court on direct appeal. 609 S.E.2d at 610. The Virginia Supreme Court rejected that argument, however, interpreting § 8.01-654.2 as requiring that the jury provisions of § 19.2-264.3:1.1 "apply whether the claim is raised in a direct appeal or as a habeas corpus petition." 609 S.E.2d at 610.

Walker claims that *Burns* has somehow clarified that the jury provisions of § 19.2-264.3:1.1 are a substantive component of his rights under *Atkins* that must be applied to his case. We disagree. *Burns* squarely holds that the jury provisions of § 19.2-264.3:1.1 apply to mental retardation claims that proceed in state court, regardless of whether they are raised on direct review or in a state habeas proceeding. This is wholly consistent with the language of § 8.01-654.2, which expressly states that "[t]he provisions of §§ 19.2-264.3:1.1 and 19.2-264.3:1.2 shall govern a determination of mental retardation made pursuant to this section" — referencing claims brought in state court. *Burns* does not address the language that our panel found to be controlling when Walker originally raised this claim — specifically, the provision providing that: "If the person has completed both a direct appeal and a habeas corpus proceeding under subsection C of § 8.01-

654, he shall not be entitled to file any further habeas petitions in the Supreme Court and his sole remedy shall lie in federal court." § 8.01-654.2.

In short, *Burns* merely clarifies that the jury provisions of § 19.2-264.3:1.1 apply to all *Atkins* claims brought in a state court proceeding, both on direct review and state habeas review. This does not affect our prior determination that Walker is not entitled to a jury in this case because he is in federal court. Accordingly, the district court did not err by refusing to empanel a jury to determine Walker's mental retardation claim.

## IV

Based on the foregoing, we affirm the judgment of the district court.

*AFFIRMED*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the Supreme Court held that the imposition of the death penalty on individuals with mental retardation violates the Eighth Amendment. While the Supreme Court "le[ft] to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences," *id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-17 (1986)) (internal quotations omitted), it surely set some floor for determining who is mentally retarded.

The Supreme Court found that "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses, . . . [mentally retarded persons] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeop-

ardize the reliability and fairness of capital proceedings against mentally retarded defendants." *Id.* at 306-07. Thus, there is a substantive component of the Eighth Amendment that must not be eviscerated by judicial interpretation of state definitions of mental retardation. Yet, today's result allows the Commonwealth to defeat any mental retardation claim, no matter how compelling in its entirety, by cherry picking evidence relevant to a single component of Virginia's definition. This does satisfy *Atkins*' mandate.

While I agree that both prongs of the Virginia definition must be satisfied for a defendant to prove mental retardation, I depart from the majority's assertion that each component of the definition may always be read in isolation. The Virginia statute itself states that the defendant must "prov[e] that he is mentally retarded by a preponderance of the evidence" and not that the defendant must prove each component by a preponderance of the evidence. Va. Code Ann. § 19.2-264.3:1.1(C) [hereinafter Section 3:1.1]. Furthermore, though we are guided by state law, this Court has an obligation to fulfill the federal Supreme Court directive from *Atkins* that persons with mental retardation shall not be executed. The spirit of *Atkins* cannot be upheld by an interpretation of a mental retardation definition that ignores vast quantities of relevant evidence as well as blatant constitutional violations that prevent a petitioner from presenting his claim. For example, it must not be that a court tasked with following *Atkins* may find it immaterial that the defendant was diagnosed as mentally retarded by scoring more than two standard deviations below the mean on an I.Q. test, regardless of how low the score, simply because a defendant can have intimate relations with a woman or obtain a driver's license.

The majority cites to our decision in *Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008) to support its conclusion that it is unnecessary to reach Walker's intellectual functioning arguments. In *Green*, we found that under Virginia law, "Green must prove both prongs of Virginia's statutory definition for

mental retardation in order to establish that he is mentally retarded." *Id.* at 301 (citation omitted). We then affirmed the district court's dismissal of petitioner's *Atkins* claim based on evidence relevant to the adaptive functioning prong of Virginia's definition of mental retardation. *Id.* at 301-03.

I believe *Green* comes perilously close to the substantive floor set in *Atkins* by seemingly analyzing the two prongs of the Virginia definition independently.[1] In *Green*, however, we affirmed the dismissal of the mental retardation claim only after finding that "the district court's (and magistrate judge's) consideration of the evidence [relevant to petitioner's adaptive functioning] was thorough." *Id.* ("The magistrate judge set forth in detail the expert testimony presented by both sides at the evidentiary hearing and explained its findings and conclusions with respect to [petitioner's] adaptive skills."). Thus, although close, the constitutional floor set in *Atkins* was protected by a thorough and complete review of petitioner's evidence of mental retardation. The same cannot be said of the case before us now.

In this capital case, a case that has generated an appellate record of over 2,300 pages, the district court's opinion spanned fewer than ten pages. In particular, the district court's "consideration of the evidence" on the adaptive functioning prong in this case amounted to at most three sentences. J.A. 2370-71. Based on this record, we cannot have the degree of confidence required to affirm the district court's dismissal of Walker's *Atkins* claim by looking exclusively to the adaptive functioning prong.

Furthermore, this Court in *Green* was not faced with serious errors by the district court that affected the petitioner's ability to present his mental retardation claim in the first

---

[1] *Green* at least analyzes both prongs. This Court in *Green*, in contrast to the majority here, undertook an analysis of the intellectual functioning prong as an alternative basis for its holding. 515 F.3d at 300.

instance: a blatant due process violation affecting Walker's ability to present evidence of significantly subaverage intellectual functioning and a failure by the district court to consider Walker's evidence of generally accepted professional practices in interpreting the results of intellectual functioning tests. These errors cannot be harmless, as the majority finds, when the floor set by *Atkins* is not secure.

Nor did we face in *Green* a case in which the district court specifically failed to adhere to a previous order from this Court. In *Walker v. True II*, 399 F.3d 315 (4th Cir. 2005), we described the nature of the evidentiary hearing that Walker should have been afforded on remand: "Walker is entitled under law both to an evidentiary hearing in which he is afforded an opportunity to *fully develop* the factual basis of his mental retardation claim and to *consideration by the courts of all of the evidence that is relevant to that claim* under Virginia's statutory framework." *Id.* at 327 (internal citations omitted) (emphasis added). If our decision in *Walker v. True II* is to have any significance, we must remand this case so that Walker may receive the consideration to which he is entitled.

Because I find that the district court committed clear error by not properly considering Walker's evidence of significant limitations in adaptive behavior, I also consider Walker's claims on the intellectual functioning prong. On that prong, I find both that the district court violated Walker's procedural due process rights and erred in failing to consider Walker's evidence of generally accepted professional practices in interpreting the results of intellectual functioning tests. Based on these errors, this Court should remand for the district court to consider all evidence relevant to Walker's *Atkins* claim. Moreover, I do not read our precedent to mean that any evidence on one prong, no matter how slight, may always be cited by the district court to preclude our review of a petitioner's full *Atkins* claim under Virginia law. *Atkins* requires a reasonable appellate review to uphold the constitutional pro-

scription of the use of capital punishment on offenders who are mentally retarded. Thus, I respectfully dissent from section II of this opinion.

I.

A.

On this record, I would find that the district court committed clear error by not properly considering Walker's evidence of significant limitations in adaptive behavior. Based on this error alone, I believe this Court has an obligation to consider Walker's claim that his due process rights were violated and his claim that the district court failed to follow this Court's previous decision and consider Walker's evidence of generally accepted professional practices in interpreting intellectual functioning tests' results.

The majority finds that Walker's *Atkins* claim fails because Walker possesses *some* adaptive skills. However, the district court made no finding that Walker was unequivocally functioning at such a level that he could not be classified as a person with mental retardation. The district court simply parroted several findings of the Commonwealth's expert that should have been considered *along with* all other evidence proffered on the issue of adaptive functioning. This *three-sentence* reasoning by the district court should not withstand any level of scrutiny.

While the district court acknowledged that Walker "suffers from below average mental intelligence, struggles to perform some basic activities, exhibits anti-social behavior, and obtains financial support from others," the court dismissed Walker's claim by citing evidence that he "has committed various crimes requiring the ability to relate to others, associated with women on a personal and intimate level, engaged in homemaking activities, seduced under-aged girls, used others to help him avoid authorities, independently invoked his

*Miranda* rights, used his brother's identity to obtain a driver's license, and obtained goods for himself while in prison." J.A. 2370-71.

Although the clear error standard under which we review the district court's findings is quite deferential, this Court may reverse the district court where its determination was "made without properly taking into account substantial evidence to the contrary." *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 361 (4th Cir. 1983). Thus, the question here is whether the district court properly took into account Walker's expert testimony regarding his *limitations* in adaptive behavior.

In its decision, the district court did not specifically discuss any of Walker's evidence; instead, it merely summarized the testimony of the Warden's expert, Dr. Hagan. On its face, this seems like a classic "battle of the experts," and thus it would be extremely difficult to find that the district court erred in believing one expert's testimony over another.[2] However, the district court did not purport to lend more credence to Dr. Hagan's testimony than to Walker's experts. Rather, the court apparently found that Dr. Hagan's testimony somehow negated Walker's showing of significant limitations in adaptive behavior. But as Walker's experts testified, the activities cited by the district court are entirely consistent with mental retardation.[3] This adheres to the logic that the American Association on Mental Retardation ("AAMR") says one must follow when applying the definition of mental retardation:

> "Within an individual, limitations often coexist with strengths." This means that people with mental retardation are complex human beings who likely have

---

[2]Indeed, this is the majority's interpretation of the district court's opinion. *Supra* at 16. However, even the majority seems to *assume* that the court credited Dr. Hagan's testimony over Walker's experts' testimony.

[3]Thus, the district court was not necessarily "presented with conflicting evidence," as the majority states. *Supra* at 17.

certain gifts as well as limitations. Like all people, they often do some things better than other things. Individuals may have capabilities and strengths that are independent of their mental retardation.

AAMR, *User's Guide: Mental Retardation: Definition, Classification, and Systems of Support* 8 (10th ed. 2002) (2007). In particular, individuals with mental retardation can have intimate relationships, perform homemaking activities, craft simple lies, and invoke[4] their *Miranda* rights. With regard to the crime cited by Dr. Hagan which purportedly demonstrated that Walker had the "ability to relate to others," Walker's expert testified that his execution of the scheme, including giving the victim his phone number, did not demonstrate a high level of cognitive or conceptual ability.

Because the district court did not properly consider Walker's evidence of significant limitations in adaptive behavior, the district court committed clear error. This basis is sufficient for this Court to proceed to Walker's arguments on the intellectual functioning prong. In addition, I believe that *Atkins* requires more in this case than simply relying on the Commonwealth's evidence of Walker's adaptive functioning, to the exclusion of all else, in order to dismiss Walker's claim of mental retardation.

### B.

Because the majority relies only on the Commonwealth's evidence of Walker's adaptive functioning, it fails to recognize a blatant due process violation by the district court. This constitutional violation resulted in the exclusion of two empirical tests that satisfied the intellectual functioning component of Virginia's definition of mental retardation, thus preventing Walker from fully developing the basis for his claim, in con-

---

[4]In fact, the record indicates that Walker did not affirmatively invoke his *Miranda* rights but rather merely remained silent.

tradiction of our previous decision in *Walker v. True II*, 399
F.3d at 327.

In order to establish "significantly subaverage intellectual
functioning," Virginia requires the "administration of at least
one standardized measure generally accepted by the field of
psychological testing." Section 3:1.1(B)(1). The statute fur-
ther directs the Commissioner of Mental Health, Mental
Retardation and Substance Abuse Services (the "Depart-
ment") to "maintain an exclusive list of standardized measures
of intellectual functioning generally accepted by the field of
psychological testing." *Id.*

On January 4, 2005, the Department published the exclu-
sive list of standardized measures as required by Section 3:1.1
(the "January list"). It is undisputed that the January list was
in effect at the time that this Court reversed the district court's
dismissal of Walker's petition. Included in the January list
were three standardized tests administered to Walker: the
Comprehensive Test of Nonverbal Intelligence ("CTONI"),
the General Ability Measure for Adults ("GAMA"), and the
Wechsler-series tests.

Walker's scores on two tests, the GAMA and CTONI, were
indisputably two standard deviations below the mean, and
both of those tests were included in the January list. Walker
relied on the January list in developing the record to support
his *Atkins* claim, and Walker was required to submit all expert
disclosures by September 7, 2005. The Department only pub-
lishes its list on its website, and according to Walker, the Jan-
uary list remained posted until after the commencement of
Walker's evidentiary hearing, which began on November 1,
2005. On the first day of the hearing, Dr. James Morris, the
Director of the Office of Forensic Services for the Department
and the person with "final responsibility for what's included
or not included on the list," J.A. 1598, testified that the
GAMA qualified as an approved measure on Virginia's pub-
lished list. Dr. Morris also testified that the public could rely

on the list that was published on the Department's website, which contained both the GAMA and the CTONI.

Then, in January 2006, after the close of the evidence, the Warden filed a post-hearing brief. This brief referenced a new list of I.Q. tests approved by the Department for use in capital proceedings. That new list ("the October list") bore a date of October 31, 2005, which was the day prior to Walker's hearing. According to Walker, neither the Warden nor Dr. Morris disclosed the existence of the new list to the district court or himself before this post-hearing brief. The October list did not include either the GAMA or the CTONI as approved measures.

Following the evidentiary hearing, the district court found that Walker could not prove that he scored two standard deviations below the mean on an approved measure. In reaching this conclusion, the district court relied on the October list and excluded Walker's scores on the GAMA and CTONI.

Under the Due Process Clause of the Fifth Amendment to the United States Constitution, no person shall be "deprived of life, liberty, or property, without due process of law." At a minimum, procedural due process requires both fair notice and an opportunity to be heard. *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950). In order to determine whether an individual has received fair notice, this Court "must examine the relevant facts of each case." *United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997). While "[g]enerally, ignorance of the law or a mistake of the law is no defense," courts will determine "fair notice" by examining whether particular persons would reasonably know the consequences of their conduct. *See id.* (internal citations and quotations omitted); *see also Goodman v. United States*, 151 F.3d 1335, 1337 (11th Cir. 1998) (per curiam).

This concept of fair procedure is of "special importance . . . in the capital sentencing context." *Lankford v. Idaho*, 500

U.S. 110, 125 (1991). This Circuit has impliedly recognized this concept as well. In *United States v. Barnette*, 211 F.3d 803, 824 (4th Cir. 2000), this Court vacated a death sentence where the defendant was unable to present surrebuttal evidence to counter rebuttal evidence of an aggravating factor because such an action violated the concept of "simple fairness."

In the present case, the district court's application of the October list did not give Walker "fair notice" of the requirements for proving his *Atkins* claim, and thus violated the Due Process Clause. First, the October list was not discovered by the Warden until *after* the evidentiary hearing, and Walker had relied on the January list in developing and presenting evidence of mental retardation. Second, there was no evidence in the record regarding whether the October list was in fact published on the Department website prior to the hearing. Without this evidence, it is unknown whether Walker would have learned of the existence of the October list had he examined the website on that date. Indeed, Walker's own counsel avers that it checked the website on October 31st, and the October list was not posted. Third, and perhaps most importantly here, Dr. Morris, who is the person with "final responsibility for what's included or not included on the list," J.A. 1598, testified *during the hearing* that the GAMA qualified as an approved measure on Virginia's published list, J.A. 1603-04. It would be patently unfair to require Walker to conform his evidence to a list when a representative of the Department represented that a different test was on that list. Given this, the district court should have at least afforded Walker the opportunity to develop a claim of mental retardation based upon the approved measures in the October list.

The district court excluded two of Walker's I.Q. scores that indisputably were two standard deviations below the mean. In applying the October list instead of the January list without affording Walker the opportunity to develop evidence of men-

tal retardation in accordance with the October list, the district court thus violated Walker's procedural due process rights.

## C.

The district court also determined that Walker failed to show that he was mentally retarded before age eighteen. In particular, the district court found that

> [e]ach WISC-R ["Weschler Intelligence Scale for Children-Revised"] administered to Petitioner before the age of eighteen supports a finding that Petitioner, while suffering from below average mental intelligence, is not mentally retarded. The evidence presented by Petitioner of his below average mental intelligence and limitations in conceptual, practical, and social skills do not constitute mental retardation or outweigh the results of the three WISC-R administrations in 1982, 1984, and 1987.

J.A. 2368. Apparently, the district court did not consider the impact of the Flynn effect and Standard Error of Measurement ("SEM") on the 1984 administration of the WISC-R.[5] *See id.*

---

[5]Dr. Daniel Reschly testified that the Flynn effect and SEM should be considered in interpreting I.Q. scores, and thus Walker's score of seventy-six on the 1984 administration of the WISC-R would be within the range of mental retardation.

I.Q. tests are almost universally scaled so that the mean for the population is 100, with a standard deviation of fifteen. For such tests, an individual must score seventy or lower for the score to be at least two standard deviations below the mean. However, several phenomena have been identified that may be considered for purposes of adjusting or interpreting I.Q. scores.

The Flynn effect is the theory that I.Q. tests rise by .3 points per year after they are normed, and thus one must consider when an individual is administered an I.Q. test compared to when that test was last normed.

The SEM is an interpretative tool that reflects the idea that I.Q. scores have a ninety-five percent confidence interval, and thus an individual's true score is somewhere within a five-point range of the reported score.

I find that the district court erred in determining that the 1984 WISC-R full scale score of seventy-six *could not* satisfy the intellectual functioning prong of the Virginia mental retardation definition. For its part, the district court did not express any opinion regarding whether the Flynn effect could be taken to account,[6] but rather found that this Court's decisions in *Walton v. Johnson*, 440 F.3d 160 (4th Cir. 2006), and *Hedrick v. True*, 443 F.3d 342 (4th Cir. 2006), foreclosed consideration of the SEM.

The district court rejected Walker's contention that his 1984 WISC-R full scale score of seventy-six could support his claim of mental retardation because it interpreted this Court's decisions in *Walton* and *Hedrick* as standing for the proposition that courts should "refus[e] to use the standard error of measurement to lower IQ scores in *Atkins* cases due to the inherent speculation of using the standard error of measurement to lower an IQ score when it could just as likely be used to raise an IQ score." J.A. 2370. However, the district court misconstrued the import of these two decisions. In *Walton*, this Court found that the petitioner's claim regarding the SEM should be dismissed because "Walton does not explain what this 'standard error of measurement' is or why it should reduce his particular score to 70 or less. Walton can only speculate that this standard measure error . . . actually *lowered* his given score of 77 enough to meet Virginia's mental retardation standard." 440 F.3d at 178. Similarly, in *Hedrick*, the Court declined to consider the SEM because the petitioner did not provide expert evidence regarding the application of the SEM, and thus "only speculation on [the Court's] part would lower Hedrick's IQ score of 76." 443 F.3d at 368. Fairly read, *Walton* and *Hedrick* stand for the proposition that bare allegations, without more, are insufficient to state a claim for *Atkins*

---

[6]The failure to consider the Flynn effect itself was error because this Court in *Walker v. True II*, 399 F.3d at 323, held that "on remand the district court should consider the persuasiveness of Walker's Flynn Effect evidence."

relief, and the decisions do not imply that the SEM can never be considered on account of "inherent speculation."

Nor can the district court's ruling be sustained on the ground that Walker provided no evidence on the accepted professional practice regarding the SEM. The definitions of mental retardation promulgated by the AAMR and the American Psychiatric Association state that the SEM should be considered in diagnosing mental retardation. J.A. 879, 888-89. Moreover, Walker's experts testified that the SEM creates a band of approximately five points around a particular I.Q. score, which means that an individual who scores within five points of two standard deviations below the mean should be diagnosed as having mental retardation.

Had the district court taken into account the Flynn effect and SEM, Walker's score of seventy-six on the 1984 WISC-R may have been two standard deviations below the mean. Given this, the district court erred in not considering this score for purposes of subaverage intellectual functioning or for onset before the age of eighteen. In particular, even if a score such as this is not conclusive proof of subaverage intellectual functioning, it is certainly consistent with onset before the age of eighteen, and thus it should have been considered in that regard. Thus, the district court erred in interpreting our precedent as foreclosing consideration of the SEM in assessing scores on I.Q. tests and in not considering the Flynn effect. Like the due process violation, these errors thwarted Walker's efforts to develop the basis for his mental retardation claim, in contradiction of our previous decision in *Walker v. True II*, 399 F.3d at 327.

## II.

The Supreme Court has unambiguously held that a person with mental retardation can not be executed. I fear that the substance of this constitutional prohibition is put in jeopardy by affirming a district court's dismissal of an *Atkins* claim

based on scant evidence exclusively relevant to the adaptive component of a state's mental retardation definition where, as here, the empirical tests forming the basis of the intellectual functioning component were excluded. Accordingly, I would find that in this case, the district court erred by finding that Walker had not shown significant limitations in adaptive behavior without meaningfully considering Walker's expert testimony in that regard, applying the October list without giving Walker the opportunity to develop and present evidence in accordance with the new list, and refusing to consider Walker's evidence of generally accepted professional practices in interpreting the results of intellectual functioning tests, in particular his evidence regarding the SEM. On this basis, I must dissent.